**FILED**

IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ **MAR 3 0 2012** ★

**BROOKLYN OFFICE**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X

ASHANTA MARSHALL,

                    Plaintiff,

    -against-

AFRICA MARSHALL,

                    Defendant.

------------------------------------------------------X

**OPINION & ORDER**
**08 CV 1420 (LB)**

**BLOOM, United States Magistrate Judge:**

    Plaintiff and defendant are brothers.  In 2001, the brothers Marshall began producing a series of instructional videos featuring plaintiff Ashanta Marshall's hairstyling techniques.  Plaintiff had years of experience in the hair industry, and defendant Africa Marshall, the younger brother, was interested in video production and was studying communications and marketing.  After working together for nearly four years, the brothers fought about the business and their relationship dissolved.  However, both brothers continued to promote and sell the videos through various media outlets, and they both registered copyrights with the United States Copyright Office.  They now dispute their respective rights to the videos and to the use of plaintiff's image.

    Plaintiff, proceeding *pro se*, brought an action in the Civil Court of Kings County in 2008.  Defendant found *pro bono* counsel who removed the case to this Court and filed three counterclaims.  For three years, the brothers have fought about discovery, engaged in vigorous motion practice, and attacked each other and defendant's counsel.  After completing discovery, defendant moved for summary judgment, which was granted in part and denied in part.

    The parties consented to trial before a magistrate judge pursuant to 28 U.S.C. § 636(c), and I held a bench trial on August 1 and 2, 2011.  The following claims were tried before the Court: copyright infringement under the Copyright Act, 17 U.S.C. §§ 101-810; unfair competition pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); violation of the Anticybersquatting Consumer Protection

1

Act, 15 U.S.C. § 1125(d); and violation of plaintiff's right to publicity under Section 51 of the New York Civil Rights Law. Defendant tried one counterclaim, seeking a declaratory judgment of joint authorship under the Copyright Act. Plaintiff and two witnesses, Lancelot Taylor and Malika Stokes, testified on his behalf; defendant testified for himself.

Although the brothers' testimony reflects the same basic timeline of the creation of the videos in question, they offered very different versions of the nature of their collaboration and their respective roles in the business venture. At times, it was clear to me that both brothers were embellishing; at other times, I was uncertain whether the discrepancies were due to faulty or self-serving memory, inaccurate or egocentric perceptions of the events when they occurred, a disregard for the truth, or a combination of all of the above. Regardless of which brother was more accurate, their testimony was unmistakably colored by six years of spite, anger, and dysfunction.

I find portions of both brothers' testimony to be unreliable. Ashanta Marshall was earnest and basically forthcoming in his testimony. His passion for his work was clear, yet so was his lack of business acumen, as was evidenced by the dearth of records relevant to this dispute. Ashanta's portrayal of his supervisory role over Africa's production of the videos was at times so overstated—and his portrayal of his brother's role so diminished—that I could not credit his testimony. In contrast, Africa Marshall's testimony was largely self-serving, self-important, and evasive. He spoke a great deal but said very little, peppering his testimony with technical terms and phrases that conveyed little in substance or understanding. He contradicted his own testimony with little insight as to how that might undermine his credibility.[1] However, when Africa spoke about his relationship with his brother, he conveyed what appeared to be genuine emotions about fairness, family, and his hopes for reconciliation.

Plaintiff's two witnesses, Lancelot Taylor, a friend, and Malika Stokes, a cousin and model in one of the videos, provided little, if any, substantive evidence. While the Court believes that the

---

[1] Defendant made false or contradictory statements to authenticate evidence offered by his counsel (Tr. 213), to avoid authenticating evidence presented by plaintiff (Tr. 287), and to contravene plaintiff's cross-examination (Tr. 261, 266-67).

witnesses testified truthfully about their perceptions, these witnesses imparted very little that is helpful to resolve the parties' dispute.

Plaintiff and defendant each carry the burden of proof for their respective claims. Pursuant to Federal Rule of Civil Procedure 52(a), I find the following facts and conclusions of law.

## BACKGROUND

### I. The Brothers

The Marshall brothers had different skills from early on. Ashanta Marshall styled hair in his home as a teenager (Tr. 161), and he opened the Abode Salon on December 10, 1998 (Tr. 21-22; Ex. 2). In addition to running his own business, he worked and traveled with hair styling agencies and the Revlon cosmetics company. (Tr. 23, 51; Ex. 32.) Throughout his career, he sought to establish himself as "Ashante"—a prestigious "star stylist" and expert in his field. (Tr. 18, 99-100.) He developed a variety of hair styling techniques, gained experience in photography and instruction (Tr. 48, 141), and promoted his work and salon in various magazines and media sources (Tr. 18). From 2000 to 2008, he was featured in magazines such as Hype Hair and Sophisticates Black Hair. (Tr. 101-02.) The magazines interviewed him about trends, and articles featured him styling hair and answering questions as a "salon professional." (Tr. 102; Exs. 14, 32.) Plaintiff's promotional materials and videos state that he won an award of excellence from Revlon, that his work has appeared on television shows such as The View and The Oprah Winfrey Show, and that he has worked with various celebrities and performers. (Exs. 25, 32.) To demonstrate his sense of prestige, he featured celebrities on his website and priced his products for an affluent clientele. (Tr. 99-100.) Plaintiff's cousin and friend testified that plaintiff was successful and earned good money (Tr. 113, 124, 128), and plaintiff attributed his financial success to his "star stylist" brand and image. (Tr. 100.)

Africa Marshall had little work experience aside from working for his brother (Tr. 174-75, 278), but he had an interest in production and photography (Tr. 168). He enrolled in the Fashion Institute of Technology in 1996 and earned an Associate's degree in advertising and marketing communications in

2001. (Tr. 162-64.)  At FIT, he studied video production and learned marketing and branding techniques, which he tried to apply to his work with his brother.  (Tr. 154-55, 185.)  When his work with Ashanta ended, Africa started his own production company.  (Tr. 279.)

## II. Working Together

Before the videos were made, defendant worked in plaintiff's Abode Salon, where he assisted plaintiff with tasks such as booking appointments, photography, redesigning the salon's website, and promoting the salon to the media.  (Tr. 21, 23-24; Ex. 1.)  Plaintiff paid defendant in cash based on the tasks he completed, though plaintiff did not pay employment taxes for defendant.  (Tr. 19-21, 23-24, 46-47, 56-57, 59; Ex. 1.)  Plaintiff testified that he entered into a written work agreement with Africa in 2000 (Tr. 57-60), but defendant denied that any written agreement existed (Tr. 176-77).  No written agreement was ever produced.  At trial, plaintiff characterized defendant as an unskilled personal assistant who ran errands for him and helped at the salon (Tr. 23-24, 51-52, 63), while defendant characterized his position as a "consultant" for marketing and branding (Tr. 172-73).  Africa Marshall continued to work at the salon until 2005.  (Tr. 46, 236-37.)

## III. Creating the Instructional Videos

The videos were created under the name "Hair To Go" starting in 2001.  (Tr. 22-23, 152, 176.) The brothers never incorporated or formed a legal partnership, but they often referred to their enterprise as HTG Corp., HTG Co., HairVideoMall, Inc., or hairtogo.8m.com/The Abode Salon.  (Tr. 230-31; Exs. 21, 26, 27, 32.) Together, the Marshalls created a series of nineteen hour-long instructional videos, as well as multiple advertisements and websites promoting "star stylist Ashante" and his various styling techniques.[2]  The videos feature plaintiff demonstrating step-by-step techniques on models.  The videos also contain promotional sequences of photographs and advertisements, and a closing sequence with

---

[2] All nineteen videos were introduced as evidence and are part of the record at Exhibit 32. The videos bear the following titles: Remove it, Perfect Style, Perfect Style 2, Girl Curls, Cut & Style, Cut & Style 2, Cut & Style 3, Intra-Blend Extensions, Perfect Hair Extensions, Micro-Lace Extensions, Dream Hair Extensions, Custom Fusion, Intertwist Extensions, Glamour Hair Extensions, Gorgeous Hair Extensions, Long Hair Cuts, Long Hair Cuts 2, Fabulous Hair Illusions, and Cut & Style 4. (Ex. 32.) The brothers also worked together on a twentieth video which was not completed or released while they were still in business together. (Tr. 186, 304.)

"Ashante's Word's [sic] of Wisdom," clips of outtakes, information about how to order videos, and streaming credits. (Ex. 32.) The credits attribute the hair styling to plaintiff, and the editing and photography direction to defendant. (Tr. 56, 98, 137-38; Exs. 13, 32.) The credits for five of the nineteen videos state the videos were "produced by" "HTG. Co." or "HTG Corp." (Exs. 13, 32.) Plaintiff provided the funding and equipment to film and promote the videos (Tr. 24, 41, 171-72, 180), and much of the filming and editing took place in the Abode Salon and in the brothers' mother's home (Tr. 43-44, 170, 178-79). Each video took about two to three hours to record. (Tr. 47.)

The precise details of the brothers' initial agreement and their actual contributions to the videos were disputed at trial; while it is clear that the filming of the videos was largely collaborative, the brothers each overstated their contributions to buttress their respective legal claims. Ashanta claimed to have sole control over Hair To Go and the video production process, while Africa depicted an equal partnership where both brothers shared decision-making power and contributed their expertise.

**A. Plaintiff's Testimony**

Ashanta testified that he conceptualized Hair To Go as a brand or "call-service" related to his Abode Salon (Tr. 21-23, 138), and that he intended from the beginning to own the videos as their sole creator and author for copyright purposes (Tr. 26, 57-58). He stated that the video project was contemplated as part of the written employment agreement the brothers signed in 2000, which stated that plaintiff would be the sole owner of the videos, and that defendant would record the videos and work in the salon. (Tr. 57-59.) He summarized his view of the brothers' arrangement as follows: "I had total control of my business. I had decision making authority and I superintended every part of my business. . . . [Defendant] had no decision making authority. . . . [W]hatever he did I was right there directing and superintending what he did over my business." (Tr. 18.) Plaintiff stated that he referred to defendant as his assistant or employee (Tr. 63), and he presented his cousin Malika Stokes, who testified that she understood Africa to be Ashanta's employee (Tr. 128-29).

5

Plaintiff testified that he directed the filming and production process, provided all funding and equipment, took photographs, wrote skits and designed scenery, selected music, took some of the photographs used in the videos and video covers, air brushed the photographs, and edited or assisted in editing the videos and print advertisements. (Tr. 40, 42-46, 89, 93-94.) Before shooting the films, plaintiff required models to sign multiple releases, including to "The Abode Salon/Hairtogo.8m.com" and to plaintiff as an individual. (Ex. 21; Tr. 89-93, 288-91.)

Plaintiff denied that defendant had any authority over the video project; he stated that his brother lacked the education and knowledge to be his partner, or even to perform the videography and website/graphic design tasks that formed defendant's primary role. (Tr. 48.) Plaintiff consistently referred to defendant as an amateur acting under plaintiff's direct supervision and denied that Africa made any creative contribution. He described defendant's input as holding a camera, assisting with editing and graphics, and incorporating the sound and music that plaintiff selected. (Tr. 20-33, 42-44.) When the brothers fought during the video shoot for Perfect Hair Extensions, plaintiff replaced defendant with another camera operator and later decided to re-shoot the video because he was unhappy with the quality of defendant's work. (Tr. 31-33.)

### B. Defendant's Testimony

Africa Marshall testified that he was a co-owner and founder of Hair To Go, that he never considered himself plaintiff's employee, and that plaintiff never referred to him as an assistant or employee. (Tr. 148, 165, 173, 257.) He stated that the brothers explicitly agreed to a 50-50 partnership and joint ownership of any copyrights to the videos, though he testified that no written agreement existed. (Tr. 165, 176-78.) He testified that plaintiff had agreed to contribute his hair styling expertise and funding for the videos, that defendant would contribute technical expertise related to videography and production, and that they would work together on marketing and promotions. (Tr. 165-68, 171-73, 178, 180, 257.) Defendant also attempted to demonstrate his role in the Hair To Go business by presenting a "feasibility report" that he created to gauge the success of the hair video sales. (Tr. 154-61;

6

Ex. 24.) Dated June 14, 2001, the report cover states that it was "Prepared for: Ashante/Africa Marshall" and "Written by Africa Marshall, Project Manager"; it includes charts of potential business costs, a list of places the videos could be sold, and a questionnaire. (Ex. 24.) The report reads like an unfinished school assignment, and even defendant testified that plaintiff "decided we should do hair videos" without the report. (Tr. 162; Ex. 24.) The report does little to support defendant's testimony regarding his professional skills and his contribution to the business at the time.

Defendant testified to a largely collaborative production process; even when he claimed to "direct" or "coordinate" some tasks, he described plaintiff's contributions to the same tasks. Defendant stated that he helped plan the videos' content and filming, and that he was responsible for acquiring models, ensuring the models wore solid colors, and obtaining music for the videos. (Tr. 152-54, 165-66.) For the first video, he worked with plaintiff to create an outline and script.[3] (Tr. 186-89; Ex. 25.) During the filming, he was responsible for photography, videography, and lighting, and he also exchanged some dialogue with plaintiff. (Tr. 165-66, 189-90.) Defendant edited the videos, arranged the music, created graphics and effects for the videos, and worked with plaintiff to promote and sell the videos. (Tr. 153, 166, 168.) Although defendant testified that he was solely responsible for this "post-production" work, he also stated that plaintiff helped edit some videos and would check defendant's completed editing work for "hair technicality errors." (Tr. 166, 168, 178, 180.) Defendant also took most of the photographs on the video covers, contributed to the photography used in the videos, and helped design the logos used in the videos and promotions. (Tr. 177, 206-12.)

### C. Evidence from the Videos[4]

The videos themselves objectively reflect the brothers' personal and professional relationship at the time relevant to this dispute. On screen and through voiceovers, the parties and commentators

---

[3] The script the brothers prepared for Intra-Blend contains the following note between other lines of dialogue, "Note: You can add or edit, but do not go over the time limit for the segments." (Ex. 25 at DER 000275.) The record does not reflect who wrote the note.

[4] The Court viewed portions of all videos except "Long Hair Cuts" and Long Hair Cuts 2," which did not open. (Ex. 32.) Although most of the videos were filmed without scripts, a draft of the script for the parties' first video, Intra-Blend, (Ex. 25), offers a sample of the dialogue used and includes an overview of how the videos depicted plaintiff's styling background.

frequently self-identify as "we," Hair To Go, and the Abode Salon, though plaintiff also references his personal techniques and career as a stylist. (Ex. 32.) In addition, the videos were "filmed unscripted for a natural feel."[5] (Ex. 32.) Throughout the videos, the parties answer phone calls, engage in dialogue with each other and various models, perform comedy sketches in full costume, and debate over whether the camera is still taping. At times, the scenes are filled with laughter, and the brothers both improvise, joke with each other, and offer ideas. However, the videos also show plaintiff's occasional annoyance or dissatisfaction with his brother for wasting time. At those times, plaintiff distinctly acts as Africa's supervisor, or perhaps, simply as his older brother.

## IV. Promoting & Selling the Hair To Go Videos

The brothers worked together to promote and sell the videos through three sales mechanisms: online, by telephone, and through magazine advertisements. (Tr. 190.) Hair To Go operated two websites: www.hairtogo.8m.com, which was started prior to the creation of the first video in 2001, and www.hairvideomall.com, which was registered in 2004. (Tr. 76; Ex. 25.) The brothers prepared the text for the websites together, but defendant was primarily responsible for designing the sites. (Tr. 205.) The www.hairvideomall.com website featured images of the company's advertisements, a variety of photographs, descriptions of the videos, information about the business, and links for purchasing the videos through PayPal. (Ex. 15.)[6]

In addition to the websites, the brothers worked together to design print advertisements and communicate with editors about placing the advertisements in magazines. (Tr. 173, 191-204.) They sent magazine editors "press kits" that promoted the Abode Salon and Hair To Go (Tr. 192-95); two of the three "press kit" cover letters in evidence also reference the videos (Ex. 27). Because the parties'

---

[5] This text appears in several videos as an introduction to short clips of outtakes. The rolling text at the end of Cut & Style states: "As you know in life, nothing is totally perfect. Sometimes these small imperfections provide tons of laughter and cherishable moments for us. All of our videos are filmed unscripted for a natural feel. Now we will take you behind the scenes and show you some of our funniest and hilarious out takes. Thank you for purchasing this video." (Ex. 32.)

[6] Exhibit 15 also includes a screenshot of a website that plaintiff identified as hairtogo.com; that screenshot features descriptions of the videos. (Tr. 71-73.)

claims rely in part on how the brothers attributed their contributions to the videos, the Court focuses on how the parties credited their work. First, a press kit letter from both brothers to "Helen" refers to "our . . . video" and "we." (Id.) A letter to "Amy" from Africa states that "celebrity hair stylist Ashante" has a video available, and it includes credits attributing the photography to defendant and hair styling and make-up to plaintiff. (Id.) The record also contains five print advertisements from the time the brothers worked together. (Ex. 26.) Some of the ads refer to HairVideoMall, and others to Hair To Go. Four of the five ads reference plaintiff and "his" DVDs or videos, although the same ads note the videos are "from Hair To Go" or "from HairVideoMall.com," or also refer to "Hair To Go's…DVD's." (Id.)

The brothers initially tried to sell the videos for $120.00 each before reducing the price to $99.00, and then to $59.99. (Tr. 35, 75, 87.) Sales started slowly and grew as the prices fell; the brothers sold about eight videos per month in 2001, and twelve to fifteen videos per month by 2003 and 2004. (Tr. 36.) The parties only presented records of sales through the PayPal website after 2005; however, plaintiff testified that PayPal sales began in 2004 and prior records were kept on a computer at the Abode Salon. (Tr. 38-39.)

Both brothers were involved in maintaining the business records for the video sales. Plaintiff stated that records were kept on a computer, in notebooks, and on PayPal (Tr. 38, 40), and defendant stated that he kept the books in an Excel file and through PayPal (Tr. 181). The brothers maintained joint checking and savings accounts at Washington Mutual Bank from 2004 to 2005; the bank records in evidence show that the accounts were used to make some business-related purchases. (Tr. 49-50; Ex. 12.) However, the nature of the accounts is otherwise disputed. Plaintiff testified that he opened the accounts to have access to cash for personal and occasional business expenses, and that he added defendant so defendant could run errands or access funds when plaintiff was unavailable. (Tr. 51-54, 63, 132-34, 141.) Defendant agreed that the account was used for business purchases, but he also testified that "we" opened the account so defendant could access his share of the profits from the videos, and that the money from the video sales went directly into that account. (Tr. 232-33.) However,

9

defendant also stated that the brothers had agreed not to withdraw those funds, and he only made a single $500 withdrawal for personal use. (Tr. 236, 306.) Defendant's other testimony about the account was riddled with contradictions and confusion, which reflects his limited involvement in the account's creation or management and with the video revenues in general. (Tr. 232-36, 306.)

Plaintiff paid defendant in cash for the work he performed on each video and for the work he did at the salon. (Tr. 19.) The payments were usually around $200 to $300 each week, and plaintiff paid defendant $800 for one video in 2003. (Tr. 46-47, 138.) The payments came from the salon funds before the videos began selling, and plaintiff recorded some of the payments in a notebook and on a computer. (Tr. 19, 21; Ex. 1.) Plaintiff stated that in late 2002 or 2003, he also began paying defendant a fifty-percent commission for video sales, though he testified that those payments stopped in the end of 2004. (Tr. 142-45.) It is unclear how those payments were calculated or made, as defendant stated that he was to receive funds through the joint bank account from which he took only a single $500 payment. (Tr. 236.) An argument over money ended the brothers' work together.

## V. The End of the Brothers' Business Relationship

In early 2005, the brothers fought about the business and their relationship broke down. (Tr. 183-84, 237-39.) The details of the relationship's end are murky, and the parties' versions of the event were not supported with evidence beyond their own testimony. Plaintiff testified that defendant "quit" (Tr. 61), but defendant testified in detail about a fight between he and Ashanta at their mother's house. Defendant testified that near the end of February 2005, as the video sales were growing, plaintiff requested that defendant accept $125 per week so that plaintiff could use the sales revenue to recoup the money he had spent on magazine advertisements. (Tr. 183-84, 237-39.) When defendant objected to accepting less than fifty-percent of the profits from the videos, the argument escalated. Plaintiff told defendant that he was "just a worker," and defendant went to a friend's house to cool down. (Tr. 184, 237.) When defendant returned to the house, plaintiff had removed all of the business-related equipment

and materials from the house, including computers, photographs, and all of the business paperwork.  (Tr. 182-84, 238.)

The brothers stopped speaking to each other after the fight.  (Tr. 243-44.)  Plaintiff remitted a final $3,000 check to defendant's bank account on February 4, 2005; defendant testified that he was unaware of the check or $3,000 until his attorney brought it to his attention in 2008.  (Tr. 216-17, 240-43; Ex. 31.)  It is unclear whether the check was remitted before or after the brothers' relationship ended,[7] but it is clear that this was plaintiff's last payment to defendant.

## VI. Both Parties Continue Selling the Videos

Both brothers independently attempted to sell the videos—and to prevent the other from selling the videos.  Neither brother sought the other's permission regarding the sales of the work or use of plaintiff's image (Tr. 70, 290-91), and neither brother shared any profits with the other (Tr. 275).

### A. Plaintiff's Use of the Videos

Plaintiff registered Hair To Go as a sole proprietorship in 2005 (Tr. 138), and he continued to sell the videos through magazine advertisements and the internet (Tr. 135-36, 244).  The record reflects some of his revenues and expenses.  From January 1, 2005 to April 3, 2009, he received $125,147.03 from video sales through PayPal; each payment ranged from $59.99 to $549.96.  (Ex. 11.)  The record also includes eight checks that plaintiff or Hair To Go remitted for magazine advertisements from January 13, 2005 to April 26, 2007; those checks total $27,655.  (Ex. 30.)  Plaintiff was still operating the Hair To Go business at the time of the trial, though he stated that his business has been hurt by defendant's efforts to sell the videos online and notify magazine publishers of this dispute.  (Tr. 77-78.)  Plaintiff testified that he lost relationships with magazine editors at those magazines, and that the magazines stopped featuring him regularly.  (Tr. 100-04.)  He lost his production studio, requested loans

---

[7] Defendant testified that he had no knowledge of the check, and plaintiff did not testify about the check. Plaintiff's other pleadings, statements, and submissions are inconsistent. In his amended complaint and amended reply/answer, he alleged that defendant accepted the check in his hand as a final payment after he quit the business in January 2005. (Am. Compl. ¶¶ 66-67; Am. Reply ¶¶ 30, 39, ECF No. 42.) In plaintiff's post-trial submissions, he states that defendant requested the payment as a final severance payment, (Pl.'s Am. Find. of Fact & Concl. of Law, ECF No. 129 at 3), and plaintiff's opening statement described the check as "severance" pay (Tr. 7).

from his friend and cousin, and began operating his salon out of his home. (Tr. 30, 112-13, 124-25.) He also testified to experiencing distress due to this lawsuit and his efforts to stop defendant's attempts to sell the videos, and Ms. Stokes stated that "[t]his Court case has drained [plaintiff] of everything, emotionally, physically, mentally." (Tr. 124, 140.)

### B. Defendant's Use of the Videos

Defendant also began distributing the videos online through his own website and various other websites. However, each time defendant posted a site or advertisement online regarding the videos, plaintiff acted quickly to have the posts taken down. (Tr. 104, 139-40, 250, 252, 254, 294-95.) When plaintiff removed the posts, defendant then emailed the sites to explain the dispute. (Tr. 81, 254-56.) Defendant also testified that he contacted Sophisticates Black Hair and Hype Hair magazines to request that they not publish defendant's work, including the Hair To Go videos and the photographs defendant took for Hair To Go. (Tr. 291-93, 307.)

Defendant first created his own website, www.hairvideostore.com, in March or April of 2005.[8] (Tr. 249, 266.) Defendant testified that the 2005 site allowed customers to download the videos or purchase DVDs for $59.99 or "buy one get one free." (Tr. 250-51.) Plaintiff caused defendant's site to be taken down within two to three days, and the record contains no evidence as to the specific content or images on the site.[9] (Tr. 250.) Defendant re-initiated the site by February 2008, and plaintiff again caused the site to be shut down. (Tr. 254, 290.) The record contains three pages of printouts from the 2008 website, which advertises the videos for $39.99 or "buy one get one free." (Ex. 14; Tr. 76, 253-54, 266-67.) Defendant testified that he designed the site using the same layout as the www.hairvideomall.com website because he thought he was entitled to use the work that he created for

---

[8] The Court takes judicial notice that defendant characterized his 2005 activity differently in his Rule 56.1 Statement: that "in approximately October 2005, Defendant created digital versions of the same DVDs to sell in an online subscription package called 'Hairvideopass,' which he sold through a link from a website he created during the partnership." (Def.'s Rule 56.1 Statement ¶ 6, ECF No. 71.) Neither party testified about "Hairvideopass" at trial.

[9] In reference to defendant's testimony about the removal of www.hairvideostore.com, plaintiff's post-trial submission states that websites sent defendant "DMCA notices from plaintiff in 2005-2007." (Pl.'s Am. Find. of Fact & Concl. of Law 5.) Plaintiff did not testify or present any evidence regarding notices, claims, or other matters related to the DMCA, which references the Digital Millennium Copyright Act.

the other site. (Tr. 275.) He stated that he did not consider whether the similarities would cause confusion, and admitted that "[a] lot of the stuff I create looks alike." (Tr. 278.)  Indeed, the two websites feature similar logos and layouts, the same row of photographs on top, and some of the same text. (Tr. 75-77; Exs. 14-15.) Plaintiff testified that defendant's similar website "threw . . . off" plaintiff's business. (Tr. 77.) He also testified that three of the images of magazine pages or advertisements on the 2008 site had not been finished or published when defendant created the first site in 2005; all three feature plaintiff's photograph.[10] (Tr. 66-70, 78-79; Ex. 14.)

After plaintiff removed defendant's www.hairvideostore.com site in 2005, defendant attempted to distribute the videos through several other websites.  On December 13, 2007, he posted an advertisement on Craigslist selling the DVDs for $20 each; the ad referred to Hair To Go, mentioned plaintiff and the prices he charged clients for certain styles, and used some of the text from the www.hairvideomall.com site.[11] (Tr. 87-88, 250-52; Ex. 20.) The ad also stated that the videos "go for $60.00 each online and in the magazines."  Plaintiff caused the ad to be removed from Craigslist within a few days. (Tr. 250-52.) Defendant also posted the videos on www.lulu.com and www.brightcove.com, sites which allowed consumers to purchase and download the videos; he testified that he posted the videos sometime in 2007. (Tr. 252-53.)

Defendant also posted short video advertisements for the hair videos on YouTube under the moniker "thespotreview"; the record includes a screenshot of one the posted videos, "hairvideostore.com perfect hair extensions video!," which plaintiff printed on April 19, 2008.  (Tr. 80-83; Ex. 17.)  The forty-five second video was posted on February 7, 2008 and was viewed 1,218 times.  The video shows plaintiff and a model with "hairvideostore.com" superimposed on top.  The printout also shows two

---

[10] Plaintiff testified that at least two of the ads were not created until 2006 or 2007, and the third was printed in 2005 but did not run at that time.  (Tr. 66-70; Ex. 14.)  He described in detail a specific advertisement that he designed in 2007 using a large photograph from a boat trip in August 2006, and he stated that Hype Hair magazine published the ad in 2007. (Tr. 67-68, 78-80; Ex. 14, 16.) Defendant testified that he had taken some of the smaller photographs and created some of the graphics in that ad. (Tr. 256-57.) Plaintiff also described a photograph of himself and "music recording artist, Olivia" used in a magazine feature that was published between 2006 and 2007. (Tr. 69.)

[11] The printed copy of the advertisement is dated December 2007; prior to seeing the printout at trial, defendant testified that he posted the ads a few months after his www.hairvideostore.com website was removed in 2005.  (Tr. 250.)

other videos with similar titles under the heading "More From: thespotreview": "hairvideostore.com dream hair extensions video," which was viewed 3,493 times, and "hairvideostore.com microlace hair extension video," which was viewed 3,336 times. (Tr. 80-83; Ex. 17.)

Finally, defendant posted the hair videos to www.thepiratebay.org, a bittorrent site which allowed consumers to download the videos for free.[12] (Tr. 83-86; Exs. 18, 19.) It is unclear when defendant posted the videos on The Pirate Bay, but they were online when plaintiff printed two screen shots on April 23, 2008. (Ex. 18.) Defendant later removed the videos from the site. (Ex. 19.)

Defendant estimated that he sold only nine to fifteen videos through his website or other online advertisements, though defendant produced no evidence of those sales at trial. (Tr. 274-75.) Defendant is no longer in the business of producing hairstyling videos; he testified that he "had an idea of taking different stylists and doing a set of hair videos," but that he "didn't get around to that yet." (Tr. 279, 304-05.)

## C. Copyrights

Both brothers copyrighted some of the videos. Plaintiff copyrighted eight of the nineteen videos during October 2005 to February 2006; those copyrighted videos include Perfect Hair Extensions, Cut & Style 4, Cut & Style, Remove It!, The Intra-Blend Technique, Long Hair Cuts 2, Intertwist Extensions, and Dream-hair Extensions. (Tr. 26-31, 131; Ex. 3-10.)[13] On his applications to the United States Copyright Office for seven of the videos, he listed the "nature of authorship" as "creator of video and instructor" or "creator and instructor"; he did not list anything under that category for the eighth

---

[12] The text on defendant's The Pirate Bay posting stated that, "Ashante quickly copyrighted the videos with the copyright office...," that the videos were "exhibited free of charge for all to see!!," and that there was "[n]o need to pay $30.00 for each" video. (Ex. 18.)

[13] At trial, plaintiff produced copies of his original copyright registration certificates for seven of the nineteen videos: Perfect Hair Extensions, Cut & Style 4, Cut & Style, Remove It!, The Intra-Blend Technique, Long Hair Cuts 2, and Dream-hair Extensions (Exs. 3-9); he also produced a printout from the Public Copyright Catalog of the United States Copyright Office to demonstrate his copyright registration for Intertwist Extensions (Ex. 10). Defendant produced a copy of his registration certificate for the compilation of nineteen videos. (Ex. 23.) The parties stipulated that the copies were genuine and the originals were authentic. (Tr. 149.) See Fed. R. Evid. 1003.

14

application.[14]  (Ex. 3-10.)  No other author is listed on these applications.  At trial, plaintiff stated that he did not register the copyrights to the videos until 2005 because he waited until he had made more videos and started advertising, and because he was busy in earlier years.  (Tr. 145-47.)  He also testified that he only copyrighted eight of the videos due to cost and because he "got sidetracked" by his dispute with his brother.  (Tr. 147.)  Defendant registered all nineteen videos as a compilation on September 11, 2007; his registration certificate states that the "author" created the following: videography, photography, editing, musical arrangements, special effects, and artwork.  (Tr. 150-51, 268; Ex. 23.)  No other author is listed on the certificate; defendant testified that he did not list his brother because plaintiff had already copyrighted the other videos.  (Tr. 151-52.)  Defendant also testified that he registered the copyright to protect his interest after plaintiff copyrighted the videos, and that he waited to register the copyright because he thought he had an automatic joint copyright or that plaintiff would include his name on a copyright.[15]  (Tr. 151-52, 177.)

## LIABILITY

### I. Standard of Proof

In this civil case, the parties bear the burden of proving the elements of their claims by a preponderance of the evidence. "To establish a fact by a preponderance of the evidence means to prove that the fact is more likely true than not true. The preponderance standard is no more than a tie-breaker dictating that when the evidence on an issue is evenly balanced, the party with the burden of proof loses." Torres-Cuesta v. Berberich, No. 08-CV-1382 (ARR)(LB), 2011 WL 3298448, at *11 (E.D.N.Y. Aug. 1, 2011) (internal quotation marks and citations omitted).

---

[14] Neither party raised the issue that plaintiff's certificate for the Perfect Hair Extensions video states that his contribution was a "work for hire." (Ex. 4.)  As that certificate also states that plaintiff is the "creator and instructor" of the video, and it is clear from the parties' testimony that plaintiff never considered his own contributions to be a "work for hire," I find this was a clerical error by plaintiff.
[15] Defendant stated that he had not copyrighted the twentieth video because he "didn't get around to it yet." (Tr. 304.)

## II. The Parties' Copyright Claims

The Copyright Act of 1976 extends copyright protection to "original works of authorship fixed in any tangible medium of expression," including "motion pictures and other audiovisual works." 17 U.S.C. § 102(a). "The owner of a copyright has the exclusive right to—or to license others to—reproduce, perform publicly, display publicly, prepare derivative works of, and distribute copies of, his copyrighted work." Arista Records v. Doe 3, 604 F.3d 110, 117 (2d Cir. 2010) (citing 17 U.S.C. § 106). Here, the parties assert competing claims regarding their rights to reproduce and distribute the Hair To Go videos under the Copyright Act.[16] Plaintiff brings a copyright infringement claim against defendant regarding eight of the nineteen videos. Defendant counters plaintiff's claim by seeking a declaratory judgment that the brothers jointly authored all nineteen of the videos, and he seeks an accounting of plaintiff's profits from the video sales.[17] The brothers' claims are mutually exclusive—"co-authors cannot sue one another for copyright infringement." Kwan v. Schlein, 634 F.3d 224, 229 (2d Cir. 2011) (plaintiff claiming copyright infringement "cannot recover unless she was the sole author" of the work).[18] As the success of both brothers' claims relies on whether their collaborative efforts resulted in rights as joint authors under the Copyright Act, I first consider defendant's joint authorship claim.

---

[16] "The district courts shall have original jurisdiction of any civil action arising under any Act of Congress relating to patents, plant variety protection, copyrights and trademarks." 28 U.S.C. § 1338(a).

[17] In matters already within the Court's jurisdiction, the Declaratory Judgment Act, 28 U.S.C. § 2201(a), gives the Court authority to "'declare the rights and other legal relations of any interested party seeking such a declaration' in 'a case of actual controversy.' An 'actual controversy' exists if there is a 'substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" John Wiley & Sons, Inc. v. Visuals Unlimited, Inc., No. 11–CV–5453–CM, 2011 WL 5245192, at *3 (S.D.N.Y. Nov. 2, 2011) (quoting Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005)). Here, defendant clearly meets the Second Circuit's two prong test for determining if a copyright matter presents an "actual controversy" at the time it was filed: (1) plaintiff's conduct has "created a real and reasonable apprehension of liability" on the part of defendant; and (2) defendant has "engaged in a course of conduct which has brought it into adversarial conflict" with plaintiff. Cosa Instrument Corp. v. Hobre Instruments BV, 698 F. Supp. 2d 345, 349 (E.D.N.Y. 2010) (quoting Ritz Hotel, Ltd. v. Shen Mfg. Co., 384 F. Supp. 2d 678, 682 (S.D.N.Y. 2005)).

[18] Under the Copyright Act, "ownership" is inclusive of "authorship," as authors are the initial owners of a copyright and have additional rights to transfer their copyright. See 17 U.S.C. §§ 101, 201(a), 304; Childress v. Taylor, 945 F.2d 500, 505 (2d Cir. 1991).

## A. Defendant's Joint Authorship Claim: Legal Standard

Copyright in a work protected under the Copyright Act "vests initially in the author or authors of the work. The authors of a joint work are co-owners of the copyright in that work." 17 U.S.C. § 201(a). The Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole." 17 U.S.C. § 101. The authors of a joint work "have undivided interests in the entire joint work, which entitle them to use or license the work as they wish, subject to the requirement that they account to their co-owners for any profits that accrue from their use of the work." Huurman v. Foster, No. 07 Civ. 9326 (MHD), 2010 WL 2545865, at *11 (S.D.N.Y. Jun. 21, 2011) (citing Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998)). The Copyright Act's legislative history clarifies the statutory definition of "joint work" as follows:

> a work is 'joint' if the authors collaborated with each other, or if each of the authors prepared his or her contribution with the knowledge and intention that it would be merged with the contributions of other authors as 'inseparable or interdependent parts of a unitary whole.' The touchstone here is the intention, at the time the writing is done, that the parts be absorbed or combined into an integrated unit . . . .

H.R. Rep. No. 94-1476, at 120 (1976); S. Rep. No. 94-473, at 103 (1975). However, the Second Circuit has stated that "collaboration is not enough" to prove joint authorship, and has created a two-prong test to minimize the "potential danger of allowing anyone who makes even a minimal contribution to the writing of a work to be deemed a statutory co-author—as long as the two parties intended the contributions to merge." Thomson, 147 F.3d at 200 (discussing Childress, 945 F.2d at 507-08). The resulting test requires that, in the absence of a written agreement establishing joint authorship, "[a] co-authorship claimant bears the burden of establishing that each of the putative co-authors (1) made independently copyrightable contributions to the work; and (2) fully intended to be co-authors." Huurman, 2010 WL 2545865, at *12 (quoting Thomson, 147 F.3d at 200). The second prong of the test "serves the valuable purpose of appropriately confining the bounds of joint authorship arising by operation of copyright law, while leaving those not in a true joint authorship relationship with an author

17

free to bargain for an arrangement that will be recognized as a matter of both copyright and contract law." Childress, 945 F.2d at 508. The Second Circuit has further cautioned that

> the requirement of intent is particularly important where 'one person . . . is indisputably the dominant author of the work and the only issue is whether that person is the sole author or she and another . . . are joint authors.' 'Care must be taken . . . to guard against the risk that a sole author is denied exclusive authorship status simply because another person render[s] some form of assistance.'

Thomson, 147 F.3d at 202 (quoting Childress, 945 F.2d at 504, 508).

To satisfy the first prong of this test, "an author must offer more than a *de minimis* addition to the work. The author's contribution must be independently created and involve some minimal degree of creativity." Huurman, 2010 WL 2545865, at *12 (quotation and citations omitted). "The requisite level of creativity is extremely low, and [t]he vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble or obvious it might be." Maxwood Music Ltd. v. Malakian, 713 F. Supp. 2d 327, 343-44 (S.D.N.Y. 2010) (quotation marks and citations omitted). Further, the joint authors' contributions need not be equal in quantity or quality. Id. at 344.

To establish the mutual intent required by the second prong of the test, courts look beyond subjective evidence of "the parties' own words or professed state of mind" to make a "nuanced inquiry into factual indicia of ownership and authorship." Thomson, 147 F.3d at 201 (citing Childress, 945 F.2d at 508-09). Although the authors need not explicitly discuss joint authorship or understand the legal consequences of their relationship, "obviously some distinguishing characteristic of the relationship must be understood for it to be the subject of their intent." Thomson, 147 F.3d at 201-02 (quoting Childress, 945 F.2d at 508). The evidence to be weighed will vary with each case, id., but the factors frequently considered include "a contributor's decision[-]making authority over what changes are made and what is included in a work, the way in which the parties bill or credit themselves, and the parties' written agreements with third parties," Huurman, 2010 WL 2545865, at *12 (internal quotation marks and citations omitted).

18

## B. Defendant's Joint Authorship Claim: Application

Defendant bears the burden of proving that he satisfies the two requirements of co-authorship.[19]

First, he easily satisfies the first requirement to make an independently copyrightable contribution to the work. Defendant added content to the videos: he recorded the videos and took many of the photographs used in the videos, and he edited and created graphics for the videos. See Huurman, 2010 WL 2545865, at *13.

The issue of the brothers' intent when they created the videos is far more difficult to resolve. Although much of the evidence on this issue is equivocal, defendant fails to present persuasive evidence that plaintiff intended to share full authorship rights with defendant. Plaintiff was clearly the driving force behind the videos, which promoted him and his salon, and which he continues to produce and promote without defendant's assistance. After weighing the evidence, I find that defendant cannot establish that it is "more likely than not" that his brother intended to share joint authorship of the videos for copyright purposes. I consider the following factors to come to this decision.

First, defendant fails to demonstrate that he had authority to decide what material was included in the videos. Although defendant testified that "I could not make a decision without [plaintiff] and [plaintiff] could not without me," no other evidence supports the latter half of defendant's statement. Rather, the record supports that only plaintiff held "veto power." See Lindsay v. Wrecked & Abandoned Vessel R.M.S. TITANIC, No. 97 Civ. 9248(HB), 1999 WL 816163, at *6 (S.D.N.Y. Oct. 13, 1999) ("where one contributor retains a so-called 'veto' authority over what is included in a work, such control is a strong indicator that he or she does not intend to be co-authors with the other contributor."). It is certainly likely that defendant edited the videos and added music and graphics without the constant, direct supervision that plaintiff described.[20] However, the following facts suggest that plaintiff

---

[19] Plaintiff's post-trial submissions, as well as his amended reply/answer, argue that defendant's counterclaim is time-barred. (Am. Reply, "Defenses" ¶ 5; Pl.'s Am. Find. of Fact & Concl. of Law 11.) Plaintiff did not raise the issue at trial. As defendant's claim for joint authorship fails on the merits, I assume, without deciding, that defendant timely filed his claim.

[20] I do not believe that defendant's contribution was merely "rote or mechanical transcription that [did] not require intellectual modification," which would also fail to satisfy the requirement of an independently copyrightable contribution.

maintained decision-making authority over defendant's contributions: defendant testified that plaintiff would check his completed editing work; plaintiff replaced defendant with another camera operator during the filming of the Perfect Hair Extensions video; plaintiff decided to re-film the Perfect Hair Extensions video in its entirety because he was unhappy with the quality of defendant's footage; plaintiff, but not defendant, requested that models sign releases to him as an individual in addition to releases to Hair To Go; and defendant stated that plaintiff made the decision to make the hair videos regardless of the "feasibility report" defendant had prepared.  Taken in the aggregate, the evidence reflects plaintiff's role as the primary decision-maker for the videos.

The evidence as to how the parties billed or credited themselves is far more equivocal.[21]  The Court considers the billing on the video covers, the streaming credits on the videos themselves, the references to the brothers within the video footage and promotional sequences, how the brothers credited themselves to third parties, as well as how the brothers referred to themselves and the videos in their press kit letters, print and internet promotional materials, and other documents created for the video project.  As detailed in the factual findings above, the videos and promotional materials at times attribute the videos to plaintiff, at times to Hair To Go, and at times to both.  Regardless, it is difficult for the Court to discern whether these attributions reflect anything more than the brothers' attempts to brand their product by portraying plaintiff or Hair To Go in a certain light. (Tr. 230, 297, 308-09.) Indeed, the fact that the videos, video covers, and most of the parties' promotional materials refer to plaintiff as the "star" does not, without more, indicate authorship.  See Huurman, 2010 WL 2545865, at *13 ("claiming

Lindsay, 1999 WL 816163, at *6 & n.5 (citing Andrien v. S. Ocean Cnty. Chamber of Commerce, 927 F.2d 132, 135 (3d Cir. 1991).  In Lindsay, the Court found, based on pleadings similar to plaintiff's, that the plaintiff did not intend for a film's main photographer to share co-authorship rights: "According to the pleadings, the plaintiff exercised virtually total control over the content of the film as 'the director, producer and cinematographer' of the production. Additionally, he briefed the photographers with regards to, inter alia, the specific camera angles they were to employ, and Lindsay screened the film each day to make sure the proper footage was obtained. Based on these allegations, and implicit in the notion that the film crew was simply 'following directions,' Lindsay retained what appeared to be exclusive authority over what was included in the footage.").

[21] "[T]he manner in which the parties 'bill or credit' themselves is 'a window [into] the mind of the party who is responsible for giving the billing or the credit.'" Maxwood Music Ltd., 713 F. Supp. 2d at 344 (quoting Thomson, 147 F.3d at 203). An author's attribution of the work "to herself alone is persuasive proof that she intended this particular piece to represent her own individual authorship, and is prima facie proof that the work was not meant to be joint." Id. at 345-46 (quoting Caffey v. Cook, 409 F. Supp. 2d 484, 500 (S.D.N.Y. 2006).

to be the 'star' of the movie does not necessarily equate to claiming sole authorship of the film"). Although plaintiff now claims that he was the sole author of the videos, there is no evidence directly crediting plaintiff as author or creator. Defendant, likewise, is never directly credited with anything other than photography or editing, though his own "feasibility report" is directed to both brothers and refers to defendant as "project manager."

However, the record does contain some evidence that directly relates to the issue of copyrights: the videos themselves, the back covers of the DVD cases, and defendant's "feasibility report." First, the back covers of the videos each state "Copyright HTG Corp." or "Copyright HTG Co." (Tr. 230-31; Ex. 29.) The brothers also attribute a fictional copyright to Hair To Go at the end of each video, when the screen displays "Copyright [year] HTG Corp" or "Copyright [year] HTG Co" and a warning about infringing the Copyright Act.[22] (Ex. 32.) Although these attributions to Hair To Go do not answer the question of joint authorship, this evidence is noteworthy because the "copyright" is *not* attributed to Ashanta Marshall as an individual.[23] Finally, defendant's "feasibility report" lists "copyright" as a "Misc" cost or expense; though the report states it is "prepared for" both brothers, there is no other reference to the copyright. (Ex. 24 at DER 000257.)

The last factor the Circuit directs this Court to consider is the parties' respective powers to enter into written agreements with third parties. The record is silent as to any agreements or contracts the brothers signed in relation to the videos or advertisements for the videos, as well as to which brother could have done so. The only written agreements in evidence are the model release forms to plaintiff and "Abode Salon/Hairtogo.8m.com"; defendant did not use an individual release form. (Tr. 288-89.) All promotional materials direct payment to some form of Hair To Go or HairVideoMall.

---

[22] For example, the text of the warning on Cut & Style reads: "Copyright 2004, HTG Corp. All Rights Reserved. Unauthorized duplication of this video is a criminal act and is punishable by law. Cut & Style! Technique is patent pending." (Ex. 32.) Hair To Go was not incorporated and did not hold any copyrights at the time the videos were made. (Tr. 230-31.)
[23] The attribution of copyrights to entities other than plaintiff also casts further doubt on plaintiff's testimony that the brothers signed an initial agreement attributing the copyright for the videos solely to Ashanta Marshall.

The Court also considers a number of factors specific to this case.  Defendant urges the Court to equate attributions to "Hair To Go" to a 50-50 partnership and joint copyright.  However, the evidence does not support this conclusion.  Both brothers were involved in creating the videos, and the Court acknowledges that defendant put a significant amount of effort into the project and feels a sense of ownership in the venture.  However, the brothers' professional relationship during the creation of the videos reflects their dynamic as siblings—as the older brother and younger brother.[24]  It is likely that when their relationship was going well, their efforts reflected something more akin to a partnership; but at base, plaintiff clearly held greater decision-making power over the videos and business, including the power to determine how much defendant was paid and what tasks he performed.  While the brothers may have agreed to evenly split the profits from the videos, which would reflect joint authorship, the fact that defendant did not monitor what would be a fifty-percent share of any money earned from the videos speaks to Africa's lack of joint ownership.[25]  Defendant knew little about the shared bank account and was unaware of receiving any money from the videos.  Some of the parties' more subjective evidence is also informative. The Court credits plaintiff's testimony and that of Ms. Stokes that plaintiff referred to defendant as an assistant or employee in relation to the videos as well as while Africa worked at the Abode Salon.  Even defendant stated that at the time the brothers fought about how to share the video profits in 2005—prior to any alleged copyright violations or the parties' individual uses of the videos, plaintiff called him "just a worker."[26] (Tr. 184, 237.)

---

[24] Africa Marshall's testimony frequently sounded like a dispute that would have been aired at the family dinner table, especially when he spoke directly to his brother during cross-examination: "It would have been unfair . . . I did a lot of work for the company" (Tr. 269); "I felt at the time you would come to some sense to be my partner again.  I really didn't think you would carry on so long" (Tr. 273); "We had a dispute, and I wanted to resolve the dispute before anything.  I wanted to really resolve the dispute that we had" (Tr. 306).

[25] This kind of agreement or contract has been encouraged by the courts in instances where there is *not* joint authorship to provide for profit-sharing under the Copyright Act.  See Childress, 945 F.2d at 508-09 ("That equal sharing of rights [provided by joint authorship] should be reserved for relationships in which all participants fully intend to be joint authors.  The sharing of benefits in other relationships involving assistance in the creation of a copyrightable work can be more precisely calibrated by the participants in their contract negotiations regarding division of royalties or assignment of shares of ownership of the copyright.") (citing 17 U.S.C. § 201(d)).

[26] "Intent 'at the time the writing is done' remains the 'touchstone,' but subsequent conduct is normally probative of a prior state of mind." Childress, 945 F.2d at 508 (quoting H.R. Rep. No. 94-1476, at 120 and S. Rep. No. 94-473, at 103; citations omitted).

Thus, although Africa Marshall may have meaningfully contributed to the series of videos and the underlying efforts to sell and promote the videos, his claim for joint authorship fails. Defendant simply has not proven joint authorship of the videos by a preponderance of the evidence. As defendant's substantive claim fails, he is therefore not entitled to an accounting of plaintiff's profits. See Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 246 (S.D.N.Y. 2000) ("A claim for accounting is a remedy premised on a determination of co-ownership . . .") (citation omitted).[27]

## C. Plaintiff's Copyright Infringement Claim: Legal Standard

Because defendant's claim for joint authorship fails, the Court turns to plaintiff's claim that defendant violated his exclusive copyrights to the eight videos he registered. To establish a claim for copyright infringement, plaintiff must prove two elements: "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." Arista Records, 604 F.3d at 117 (citations omitted).

A party establishes *prima facie* evidence of the first element by presenting a certificate of registration from the United States Register of Copyrights. Jorgensen v. Epic/Sony Records, 351 F.3d 46, 51 (2d Cir. 2003). If one party produces such a certificate, the burden shifts to the opposing party to prove the registered copyright invalid. Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 109 (2d Cir. 2001). The presumption of validity may then be rebutted by defendant through a showing of non-originality or fraud. See Caffey, 409 F. Supp. 2d at 495. While "t[]he presumption of the registered copyright's validity generally is not overcome by an 'innocent misstatement[,]'...[i]it may be overcome . . . by proof of deliberate misrepresentation." Whimsicality, Inc. v. Rubie's Costume Co., 891 F.2d 452, 455 (2d Cir. 1989) (citations omitted); see also Medforms, Inc. v. Healthcare Mgm't Solutions, Inc., 290 F.3d 98, 114 (2d Cir. 2002) ("we have previously affirmed . . . that the presumption of validity

---

[27] The question of the validity of defendant's rights in the compilation of videos that he registered with the Copyright Office is not before the Court. Further, there remains an open question in the Second Circuit as to whether "a person who makes a non-*de minimis* copyrightable contribution but cannot meet the mutual intent requirement of co-authorship, retains, in the absence of a work-for-hire agreement or of any explicit contractual assignment of the copyright, any rights and interests in his or her own contribution." Thomson, 147 F.3d at 206.

was rebutted where the defendants showed the copyright holder had deliberately misrepresented facts about authorship to the Copyright Office") (citing Zitz v. Pereira, 119 F. Supp. 2d 133, 143-45 (E.D.N.Y. 1999)).

To establish the second element of a copyright infringement claim, "the copyright owner must demonstrate that (1) the defendant has actually copied the plaintiff's work; *and* (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's." Yurman Design, Inc., 262 F.3d at 110 (quotation omitted). "The word 'copying' is shorthand for the infringing of any of the copyright owner's five exclusive rights described in § 106." Arista Records, 604 F.3d at 117 (internal citations omitted).

### D. Plaintiff's Copyright Infringement Claim: Application

Here, plaintiff met his *prima facie* burden to prove valid ownership by producing genuine copies of his original copyright registration certificates for the eight videos. See supra n.12. Defendant seeks to rebut the validity of plaintiff's copyright registrations by proffering his copyright for the compilation of the videos and by asserting his claim for joint ownership. (Def.'s Prop. Find. of Fact & Concl. of Law ¶ 28, ECF No. 126.) However, defendant has failed to prove that he co-authored the videos with plaintiff, and he asserts no other evidence that plaintiff misrepresented his authorship to the Copyright Office. Defendant's certificate of registration of the compilation alone does not rebut the validity of plaintiff's registration of the eight videos. See Caffey, 409 F. Supp. 2d at 501(finding that plaintiffs had established the validity of their copyrights where defendants had made copyrightable contributions to the work but lacked mutual intent for co-authorship); Estate of Hogarth v. Edgar Rice Burroughs, Inc., 342 F.3d 149, 166 (2d Cir. 2003) (quoting the Register's letter to the Court, "the Copyright Office's examination of copyright applications is 'necessarily limited'... '[T]he Office does not make factual determinations with respect to publication or any other act done outside of the Office' and 'will register adverse claims by more than one party, which are 'not unusual.'"). As defendant proffers no evidence other than his registration of the compilation to disprove the validity of plaintiff's copyright, plaintiff's presumption of validity prevails.

24

Because plaintiff has a valid copyright in eight of the videos, he must then prove the second element of his infringement claim—that defendant engaged in "unauthorized copying" of the videos. Unlike in many copyright infringement cases, defendant does not dispute that he copied and attempted to sell the videos through multiple internet forums. It is unnecessary here to analyze the two prongs of the second element of plaintiff's infringement claim: whether defendant had access to each of the eight videos, and whether the videos he promoted were in fact "substantially similar" to the videos he and plaintiff created. Therefore, plaintiff has demonstrated that defendant infringed his copyrights with regard to the eight videos.

## III. Plaintiff's Claim for Unfair Competition under the Lanham Act

"Section 43(a) is a broad federal unfair competition provision which protects unregistered trademarks similar to the way that section 32(1) of the Lanham Act protects registered marks." Chambers v. Time Warner, Inc., 282 F.3d 147, 155 (2d Cir. 2002). "Because of its inherently limited wording, §43(a) can never be a federal codification of the overall law of unfair competition, but can apply only to certain unfair trade practices prohibited by its text." Dastar Corp. v. Twentieth Century Fox Film Corp., 539 U.S. 23, 29 (2003) (quotation omitted). Specifically, § 43(a) imposes civil liability on

> [a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device . . . which—
>> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or
>> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities

15 U.S.C. § 1125(a)(1).[28]

---

[28] The Court has jurisdiction over plaintiff's Lanham Act claims, including the Anticybersquatting Consumer Protection Act claim addressed below, pursuant to 15 U.S.C. § 1121(a), which provides original jurisdiction in the district courts for all actions arising under the Lanham Act. See Vogster Entm't, L.L.C. v. Mostovoy, No. 09-CV-1036 (RRM)(RER), 2009 WL 691215, at * 2 (E.D.N.Y. Mar. 16, 2009) (citation omitted).

"To prevail on a claim under Section 43(a), a plaintiff must show that: (1) it has a valid trademark entitled to protection, and (2) the defendant's mark infringes on the plaintiff's mark by causing a likelihood of confusion among consumers as to the origin or sponsorship of its product." Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc., 478 F. Supp. 2d 340, 356 (E.D.N.Y. 2006) (citing Time, Inc. v. Petersen Publ'g Co., 173 F.3d 113, 117 (2d Cir. 1999)). For an unregistered mark to be protectable under Section 43(a), the mark must be either "inherently distinctive, i.e., intrinsically capable of identifying its source, or . . . ha[ve] acquired secondary meaning." Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 115-16 (2d Cir. 2006) (quotation omitted); see also Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768–79 (1992). If a mark is protectable, courts analyze whether there is a likelihood of confusion based on an eight-factor test set out by the Second Circuit in Polaroid Corp. v. Polarad Elec. Corp., 287 F.2d 492, 495 (2d Cir. 1961).[29] See Hi-Tech Pharmacal Co. v. Hi-Tech Pharmaceuticals, Inc., No. 05-CV-2674 (ARR)(SMG), 2007 WL 1988737, at *5 (E.D.N.Y. July 5, 2007).

Here, plaintiff claims that defendant has used plaintiff's unregistered trademarks, such as plaintiff's name, image, and product names, on defendant's www.hairvideostore.com website, YouTube, and The Pirate Bay without plaintiff's permission, and that this has led to consumer confusion regarding plaintiff's endorsement of defendant's video sales. (Am. Compl. ¶¶ 34-45; Pl.'s Am. Find. of Fact & Concl. of Law 6.)

As an initial matter, the Court must determine whether plaintiff's purported marks—his name, the moniker "Ashante," his image, and the names of the DVD titles—are protected trademarks, that is,

---

[29] The eight Polaroid factors are:
   (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market.
Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 115 (2d Cir. 2009) (citing Star Indus., Inc. v. Bacardi & Co., 412 F.3d 373, 384 (2d Cir. 2005)).

whether they are inherently distinctive or have acquired secondary meaning. First, courts generally classify a mark according to five categories of distinctive strength: generic, descriptive, suggestive, arbitrary, and fanciful. Pirone v. MacMillan, Inc., 894 F.2d 579, 582 (2d Cir. 1990) (internal quotation omitted).

> Generic marks are those consisting of words identifying the relevant category of goods or services. They are not at all distinctive and thus are not protectable under any circumstances. Descriptive marks are those consisting of words identifying qualities of the product. They are not inherently distinctive, but are protectable provided they have acquired secondary meaning . . . . Suggestive marks and arbitrary or fanciful marks are each inherently distinctive. Suggestive marks are those that are not directly descriptive, but do suggest a quality or qualities of the product, through the use of imagination, thought and perception. Arbitrary or fanciful marks are ones that do not communicate any information about the product either directly or by suggestion.

Star Indus., Inc., 412 F.3d at 385 (quotations and citations omitted).

## A. Plaintiff's Purported Marks are not Inherently Distinctive

As to plaintiff's name and image, "[p]ersonal names and photographs are not inherently distinctive, and therefore are 'protected only if, through usage, they have acquired distinctiveness and secondary meaning.'" Brooks v. Topps Co., No. 06 CIV. 2359 (DLC), 2007 WL 4547585, at *6 (S.D.N.Y. Dec. 21, 2007) (quoting Pirone, 894 F.2d at 583); see also Pirone, 894 F.2d at 584 ("Personal names used as trademarks are generally treated as descriptive terms, since a name might be regarded as a convenient description of the fact that the individual was affiliated with the firm.") (citation omitted). Likewise, the names of the DVDs are clearly descriptive; each title identifies or describes qualities of the videos and hairstyling techniques. Because none of plaintiff's purported marks are inherently distinctive, I must analyze whether they have acquired secondary meaning.

## B. Plaintiff's Purported Marks have not Acquired Secondary Meaning

Secondary meaning refers to "a trademark's ability to identify the source of the product rather than the product itself." ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 167 (2d Cir. 2007) (quoting Two Pesos, 505 U.S. at 766 n.4).

The crucial question in a case involving secondary meaning always is whether the public is moved in any degree to buy an article because of its source. . . . Factors that are relevant in determining secondary meaning include (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use.

Genesee Brewing Co. v. Stroh Brewing Co., 124 F.3d 137, 143 n.4 (2d Cir. 1997) (quotation and citation omitted). The focus of the inquiry is on the consuming public, and "it is only necessary to show that a substantial segment of the relevant group of consumers made the requisite association between the product and the producer." Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc., 830 F.2d 1217, 1221-22 (2d Cir. 1987), overruled on other grounds by Paddington Corp. v. Attiki Imps. & Distribs., Inc., 996 F.2d 577, 585 (2d Cir. 1993)).

Plaintiff has the burden "to establish that [his] mark acquired secondary meaning *before* defendant began using [his] allegedly infringing mark." Hi-Tech Pharmacal Co., 2007 WL 1988737, at *10 (quotation and citations omitted). Whether a mark has acquired secondary meaning is "an essentially factual determination, proof of which entails vigorous evidentiary requirements." Id. "[O]pinion testimony by a proprietor is considered self-serving and of little probative value." 815 Tonawanda St. Corp. v. Fay's Drug Co., 842 F.2d 643, 648 (2d Cir. 1988) (citing 1 J. McCarthy, Trademarks & Unfair Competition § 15.13 at 688–89 (2d ed. 1984)). Plaintiff produced scant evidence to demonstrate that any of his marks acquired secondary meaning prior to March or April of 2005, when defendant first created www.hairvideostore.com. The following discussion applies to all of plaintiff's marks.

Only two of the relevant factors modestly favor plaintiff. To demonstrate his sales volume, plaintiff produced PayPal records reflecting a total of sixty-five PayPal transactions between January 1, 2005 and March 1, 2005; he did not produce records for the period prior to 2005. (Ex. 11.) As far as plaintiff's claim that defendant attempted to plagiarize his mark, "the key question . . . is whether the copying was done deliberately, so as to benefit from the plaintiff's name and good will." Gameologist

Group, L.L.C. v. Scientific Games Int'l. Inc., No. 09 Civ. 6261 (JGK), 2011 WL 5075224, at *12

(S.D.N.Y. Oct. 25, 2011) (alteration omitted) (quotation omitted). It is clear that defendant deliberately

copied the marks from plaintiff's website.

However, record evidence regarding the other four factors is equivocal or weighs against

plaintiff. Plaintiff demonstrated that he remitted checks for advertising totaling $14,572 on January 13,

2005 and March 4, 2005, and that those advertisements were directly targeted to plaintiff's audience.[30]

(Ex. 30.) These advertising expenditures are "indirect evidence of the possible effect that advertising

may have on consumers' association of the [trademark] with the source of the product." Jewish

Shepardic Yellow Pages, Ltd., 478 F. Supp. 2d at 371 (quotation omitted). While advertising

expenditures directed toward a specific consumer group can weigh in a plaintiff's favor, see Dudley v.

HealthSource Chiropractic, Inc., 585 F. Supp. 2d 433, 439 (W.D.N.Y. 2008), "[m]erely showing that a

certain amount was spent on advertising provides little support for secondary meaning." Jewish

Shepardic Yellow Pages, Ltd., 478 F. Supp. 2d at 371-72 (quotation omitted). Here, plaintiff fails to

demonstrate that these advertisements caused consumers to associate the purported marks with plaintiff.

Further, plaintiff presented no evidence of consumer studies or unsolicited media coverage. See

Gameologist Group, L.L.C., 2011 WL 5075224, at *11 (evidence of media coverage did not favor

plaintiff when it was potentially solicited as part of plaintiff's promotional strategy). Finally, although

plaintiff demonstrated that he has used his name, image, and video titles on his website and in his salon

since 2001, he presented no evidence related to his marks' exclusivity or impact, or to support his

testimony that, "I had [an] exclusive sort of business where it wasn't [a] factory market all over the

place . . . , like people came to one website to find me." (Tr. 77.) See Centaur Commc'ns, Ltd., 830 F.2d

at 1125 ("the length and exclusivity of a mark's use is evaluated in light of the product and its

consumers").

---

[30] It is unclear which advertisements were paid for by these expenditures, although the record does include copies of several undated advertisements which feature plaintiff's name and image, as well as the DVD names. (Ex. 26.) Even in these ads, plaintiff's purported marks vary in their prominence, and plaintiff's own image is quite different in different photographs.

Taking account of these factors, plaintiff has failed to demonstrate that a base of relevant consumers associated the name Ashante, plaintiff's image, or the DVD titles with plaintiff. The two factors in plaintiff's favor simply do not establish that plaintiff's marks acquired secondary meaning. Jewish Shepardic Yellow Pages, Ltd., 478 F. Supp. 2d at 366-67 (balancing these factors). Therefore, I find that plaintiff's marks are not protectable under the Lanham Act, and I need not reach the issue of whether defendant's use of the marks created a likelihood of confusion among consumers.[31] See Hi-Tech Pharmacal Co., 2007 WL 1988737, at *11 (citing Thompson Med. Co., 753 F.2d at 213 for proposition that protectability is a "threshold determination"); Jewish Sephardic Yellow Pages, Ltd., 478 F. Supp. 2d at 356.) Plaintiff's claim for unfair competition fails.

## IV. Plaintiff's Anticybersquatting Consumer Protection Act Claim under the Lanham Act

The Anticybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C. § 1125(d), "was intended to prevent cybersquatting, . . . the bad faith, abusive registration and use of the distinctive trademarks of others as internet domain names, with the intent to profit from the goodwill associated with those trademarks." Vogster Entm't, L.L.C., 2009 WL 691215, at * 3 (citing Sporty's Farm, L.L.C. v. Sportsman's Market, Inc., 202 F.3d 489, 495 (2d Cir. 2000)).[32] In pertinent part, the ACPA provides that the owner of a mark can hold another person liable in a civil action if,

> without regard to the goods or services of the parties, that person—
> (i) has a bad faith intent to profit from the mark . . . ; and
> (ii) registers, traffics in, or uses a domain name that—
>     (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; [or]
>     (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark . . . .

---

[31] Plaintiff testified that the competing marks caused actual confusion amongst magazine editors, but no other evidence was proffered to demonstrate the editors' confusion or the confusion of prospective customers. (Tr. 100-04.)

[32]     Specifically, the ACPA was designed to focus on individuals who register well-known brand names as Internet domain names in order to extract payment from the rightful owners of the marks, . . . register well-known marks to prey on consumer confusion by misusing the domain name to divert customers from the mark owner's site to the cybersquatter's own site, and target distinctive marks to defraud consumers, including to engage in counterfeiting activities.
Albert Furst von Thurn und Taxis v. Karl Prince von Thurn und Taxis, No. 04 Civ. 6107 (DAB), 2006 WL 2289847, at *13 (S.D.N.Y. Aug. 8, 2006) (internal quotation marks and citation omitted).

15 U.S.C. § 1125(d). Thus, "[t]o succeed on a claim under the ACPA, Plaintiff must prove that: (1) defendant had a bad faith intent to profit from use of the mark; (2) the mark is either distinctive or famous; and (3) defendant's domain name is identical or confusingly similar to Plaintiff's domain name." Dudley, 585 F. Supp. 2d at 438 (citing Sporty's Farm, L.L.C., 202 F.3d at 497-99); see also Freedom Calls Found. v. Bukstel, No. 05CV5460 (SJ)(VVP), 2006 WL 845509, at *12 (E.D.N.Y. Mar. 3, 2006).

Plaintiff alleges that defendant's "imposter website Hairvideostore.com is named and designed to look exactly like Plaintiff Ashanta Marshall's official website Hairvideomall.com," and that plaintiff's "true official websites" are www.Hairtogo.8m.com, www.hairtogostore.com, and www.hairvideomall.com. (Am. Compl. ¶¶ 35, 38).[33] Thus, the Court compares plaintiff's three domain names to defendant's www.hairvideostore.com.

### A. Two of Plaintiff's Domain Names Merit Protection

### 1. Legal Standard

The Court first analyzes whether plaintiff's three domain names are distinctive or famous, and thus entitled to protection under the ACPA. "Distinctiveness refers to inherent qualities of a mark and is a completely different concept from fame. A mark may be distinctive before it has been used—when its fame is nonexistent. By the same token, even a famous mark may be so ordinary, or descriptive as to be notable for its lack of distinctiveness." Dudley, 585 F. Supp. 2d at 438 (citing Sporty's Farm, 202 F.3d at 497). Courts in the Second Circuit analyze a domain name's inherent distinctiveness using the five classifications set out above. Id.; supra Part III.A.  To analyze whether an unregistered mark is "famous," however, Courts use the "rigorous criteria" set forth in the Federal Trademark Dilution Act ("FTDA"). Sporty's Farm L.L.C., 202 F.3d at 497 & n.10 (citing Nabisco, Inc. v. PF Brands, Inc., 191

---

[33] Although plaintiff presents this claim as an unfair competition claim under the Lanham Act and does not cite to 15 U.S.C. § 1125(d) in his Amended Complaint, the Court liberally construed *pro se* plaintiff's claim as arising under the ACPA. (Order Adopting Report & Recommendation at 3, ECF No. 88.)

F.3d 208, 216 (2d Cir.1999)); see also Vogster Entm't, L.L.C., 2009 WL 691215, at * 4 n.5 (citation

omitted). According to the FTDA,

> a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.
>> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.
>> (iii) The extent of actual recognition of the mark.

15 U.S.C. § 1125(c)(2).

### 2. Application to Plaintiff's Three Domain Names

The name www.hairvideomall.com is not inherently distinctive. "Hairvideomall" is at most

descriptive,[34] and plaintiff has not put forth evidence to prove the domain name has acquired secondary

meaning or "fame."[35] However, the domain names www.hairtogo.8m.com and www.hairtogostore.com

are inherently distinctive "suggestive" marks. Both marks use the name "Hair To Go," a moniker which

"suggest[s] a quality or qualities of the product, through the use of imagination, thought and perception."

Star Indus, Inc., 412 F.3d at 385. "Hair To Go" conveys that the subject matter on the site relates to

"hair," while "to go" conveys the customers' ability to "take out" hairstyling from the salon. (Tr. 22-23.)

The Court next analyzes whether these two marks are "identical or confusingly similar" to defendant's

domain name, www.hairvideostore.com.

---

[34] The Court need not parse whether www.hairvideomall.com—a website primarily devoted to selling videos—may be better classified as a generic mark "consisting of words identifying the relevant category of goods or services," or a descriptive mark "consisting of words identifying qualities of the product." Star Indus, Inc., 412 F.3d at 385. Plaintiff's mark is not protected under either classification.
[35] Plaintiff has not linked this specific domain name to his advertising expenditures, sales, or any unsolicited media coverage; nor has he provided consumer studies, demonstrated the exclusivity of his use of the mark, or shown that anyone besides defendant has attempted to plagiarize the name. As to the "fame" of www.hairvideomall.com, he did not produce any statistics about the traffic to his website, how the number of sales was linked to exposure to the website, or whether his website gained recognition among the consumers who purchased his videos. Further, neither the parties' DVD covers nor press kit letters refer to www.hairvideomall.com (Exs. 27, 29), and only two of the six print advertisements in the record refer to this website (Ex. 26 at DER 000525 and DER 000530). Rather, all of the DVD covers refer to www.hairtogo.8m.com, (Ex. 29), as do the three "press kits" (Ex. 27); of the remaining print advertisements, one names www.hairtogostore.com (Ex. 16), and three name www.hairtogo.8m.com (Ex. 26 at DER 000527, DER 000541, and DER 000549).

**B. The Parties' Domain Names are not "Identical or Confusingly Similar"**

Under the ACPA, "whether a domain name is confusingly similar to a trademark is to be evaluated without regard to the goods or services of the parties." Dudley, 585 F. Supp. 2d at 440 (citing Omega S.A. v. Omega Eng'g, Inc., 228 F. Supp. 2d 112, 127) (D. Conn. 2002)). Rather, the Court solely compares "plaintiff's mark and [defendant's] domain name, including their intrinsic sound, sight, and meaning, without reference to goods or services with which the domain name is associated by the parties' use." Id.

Neither of plaintiff's marks, www.Hairtogo.8m.com and www.hairtogostore.com, is "confusingly similar" to defendant's www.hairvideostore.com. The names do not sound alike, look alike, or bear a clearly similar meaning. They share a single generic word, and this is not a case where the "names bear such a visual resemblance that internet users would reasonably assume that the names were modified, used, approved and/or permitted by the plaintiff." Omega S.A., 228 F. Supp. 2d at 127 (finding the marks "OMEGATIME" and "OMEGAWATCH" confusingly similar); see also Dudley, 585 F. Supp. 2d at 440 (finding www.healthsourcechiro.com and www.healthsourcechiropractic.com confusingly similar).

Thus, plaintiff fails to establish a claim under the ACPA for any of his three domain names.

**V. Plaintiff's Claim for Right of Publicity under New York Civil Rights Law § 51[36]**

A defendant is liable under Section 51 of the New York Civil Rights Law when he or she uses a plaintiff's "name, portrait, picture or voice . . . within this state for advertising purposes or for the purposes of trade without the written consent first obtained." N.Y. Civ. Rights Law § 51. The statute applies "to 'cases where the plaintiff generally seeks publicity . . . but has not given written consent for a particular use' or where 'the defendant has otherwise exceeded the limitations of the consent.'" Myskina v. Conde Nast Publ'ns, Inc., 386 F. Supp. 2d 409, 414 (S.D.N.Y. 2005) (quoting Stephano v. News Group Publ'ns, Inc., 64 N.Y.2d 174, 183 (1984)). "Although plaintiffs suing under Sections 50

---

[36] This Court has supplemental jurisdiction over plaintiff's state law claim pursuant to 28 U.S.C. § 1367.

and 51 often couch their claims in a right to privacy, '[t]he right which the statute permits the plaintiff to vindicate [in such circumstances] may, perhaps, more accurately be described as a right of publicity.'" Id. (quoting Stephano, 64 N.Y.2d at 183). New York does not recognize any right to publicity other than that created by Section 51. Pirone, 894 F.2d at 585. To succeed on a claim under Section 51, "a plaintiff must prove (1) use of plaintiff's name, portrait, picture or voice, (2) for advertising purposes or for the purposes of trade, (3) without consent, and (4) within the state of New York. Hoepker v. Kruger, 200 F. Supp. 2d 340, 348 (S.D.N.Y. 2002) (quoting Titan Sports, Inc. v. Comics World Corp., 870 F.2d 85, 87 (2d Cir. 1989)) (quotation marks omitted). Section 51 also includes several statutory exceptions.

Here, plaintiff claims that defendant violated his rights of privacy and publicity under Section 51 by using his name and image to advertise the instructional videos on defendant's website and on YouTube in 2008.[37] Plaintiff satisfies the four elements of his claim under Section 51: defendant used plaintiff's name and image to advertise and profit from the hairstyling videos on www.hairvideostore.com and YouTube,[38] and defendant's use of the images on the internet was "within the state of New York." However, defendant asserts that his use of plaintiff's image to advertise the videos does not violate Section 51 for two reasons: (1) plaintiff sold or disposed of his rights in the instructional videos by sharing his copyright in the videos with defendant, and (2) defendant's use falls under one of the statute's two "incidental use" exceptions. (Def.'s Prop. Find. of Fact & Concl. of Law ¶¶ 49-55.) Further, at the time summary judgment was granted, questions of fact remained about whether plaintiff's claims are time-barred. Although defendant's post-trial submission does not again

---

[37] Plaintiff's claims regarding defendants' use of his image on the covers of the instructional videos sold on defendant's websites in 2005 were dismissed at summary judgment. (Order Adopting Report & Recommendation at 3.)

[38] "Use for 'advertising purposes' and use 'for the purposes of trade' are separate and distinct statutory concepts and violations." Amusement Indus., Inc. v. Stern, 693 F. Supp. 2d 301, 314 (S.D.N.Y. 2010) (quoting Beverley v. Choices Women's Med. Ctr., Inc., 587 N.E.2d 275 (N.Y. 1991)). "A name, portrait or picture is used 'for advertising purposes' if it appears in a publication which, taken in its entirety, was distributed for use in, or as part of, an advertisement or solicitation for patronage of a particular product or service." Beverley, 587 N.E.2d at 640 (citations omitted). "Courts have defined use 'for the purposes of trade' as use which 'would draw trade to the firm' or 'use for the purpose of making profit.'" Amusement Indus., Inc., 693 F. Supp. 2d at 314 (quotation omitted). "The court should focus on whether the use of plaintiff's image was 'sufficiently related to a commercial end' or 'mercantile rewards.'" Zoll v. Jordache Enters. Inc., No. 01 Civ. 1339 (CSH), 2003 WL 1964054, at *16 (S.D.N.Y. Apr. 24, 2003) (quotation omitted). Defendant's use of plaintiff's name and image on his website and YouTube was clearly related to defendant's commercial efforts to sell the hairstyling videos for a profit.

raise the statute of limitations—"an affirmative defense on which the defendant bears the burden of proof at trial," Cuccioli v. Jekyll & Hyde Neue Metro. Bremen Theater Produktion GmbH & Co., 150 F. Supp. 2d 566, 572 (S.D.N.Y. 2001), plaintiff repeatedly referred to the timeliness of his claims. I address the issue briefly below.

### A. Statute of Limitations

The one-year statute of limitations under Section 51 accrues "at first publication—generally interpreted as when the publication first goes on sale to the public"; each subsequent publication does not set the statute of limitations running anew. Cuccioli, 150 F. Supp. 2d at 573; N.Y. C.P.L.R. 215(3).

Because plaintiff commenced this action in March 2008, the statute of limitations would bar his claims regarding any images first published on defendant's website or on YouTube before March 2007. As to the website, defendant only posted plaintiff's image on www.hairvideostore.com in 2005 and 2008; thus, plaintiff's claims would be time-barred as to any photograph first published on the 2005 site. Although the images posted on the 2005 site are not on the record, plaintiff testified that three of the images on the 2008 site were not on the 2005 site. (Tr. 66-69.) Further, plaintiff proved that at least one of the photographs posted by defendant in 2008 was not taken until a birthday party in 2006.[39] (Tr. 66-69, 79; Ex. 14, 16.) Defendant presented no testimony or other evidence to demonstrate that plaintiff's claims for these three images are time-barred. As to the three video clips that defendant posted on YouTube—"perfect hair extensions," "dream hair extensions," and "microlace hair extensions" (Tr. 80-83; Ex. 17), the screenshot printed by plaintiff in April 2008 reflects that the "perfect hair extensions" video was posted on February 7, 2008. (Ex. 17.) While the screenshot does not list the dates the other two videos were posted, defendant did not carry his burden to demonstrate that these three videos were

---

[39] While I credit plaintiff's testimony that two other images on defendant's website—an advertisement and magazine feature—were not published until after 2005, I note that plaintiff has not provided evidence as to when the *photographs* in those images were taken or if they were used before the ad was published. (Tr. 66-69; Ex. 14.)

posted on YouTube prior to March of 2007.[40] Thus, I consider plaintiff's claims for the use of his image

in these three video clips, as well as the three photographs posted on defendant's website in 2008 (the

"2008 photographs") as timely.

### B. Statutory Exceptions

Section 51 provides a number of exceptions for lawful uses of another's name, image, or voice,

and additional exceptions have arisen from judicial interpretation of the statute. Defendant asserts two

defenses based on these exceptions.

### 1. Plaintiff has not "sold or disposed of" any rights to defendant

Defendant's first defense is based on the following statutory text:

> nothing contained in this article shall be so construed as to prevent any person, firm or
> corporation from . . . using the name, portrait, picture or voice of any author, composer or
> artist in connection with his literary, musical or artistic productions *which he has sold or
> disposed of* with such name, portrait, picture or voice used in connection therewith.

N.Y. Civ. Rights Law § 51 (emphasis added). Defendant argues that plaintiff "sold or disposed of" his

rights in the instructional videos by sharing his copyright with defendant, and that defendant may

therefore use plaintiff's name and image to advertise the videos. (Def.'s Prop. Find. of Fact & Concl. of

Law ¶¶ 49-51.) However, as defendant concedes, "[b]y selling or disposing of his or her rights in a

work, an artist . . . is deprived of a cause of action [under section 51] only against the entity to whom he

or she sold the work and any successors in interest." Chambers v. Time Warner, No. 00 Civ. 2839 (JSR),

2003 WL 749422, at *4 (S.D.N.Y. Mar. 5, 2003) (emphasis removed) (quoting ASA Music Prods. v.

Thomsun Elecs., 49 U.S.P.Q.2d 1545, 1553 (S.D.N.Y. 1998)). As decided herein, defendant did not

jointly author the videos with plaintiff, and there is no record evidence that plaintiff ever sold or

---

[40] Defendant did not testify to when he posted the video clips on YouTube. His post-trial submission appears to date the postings between the December 2007 Craigslist postings and defendant's attempt to restart www.hairvideostore.com in February 2008. (Def.'s Prop. Find. of Fact & Concl. of Law ¶ 20.)

disposed of his rights to defendant by contract, agreement, or any other means.  For these reasons, this statutory exception is inapplicable here.[41]

### 2. Defendant's use of plaintiff's name and image was not an "incidental use"

Defendant also argues that his use of plaintiff's name and image is subject to one of Section 51's two "incidental use" exceptions:[42] "In the particular context of ads for books and periodicals, New York courts have recognized an exception to Section 51 for the 'incidental' use in ads or other promotional items of material that 'prove[s] [the] worth and illustrates [the] content' of the works being advertised." Groden v. Random House, Inc., 61 F.3d 1045, 1049 (2d Cir. 1995) (quoting Booth v. Curtis Publ'g Co., 223 N.Y.S.2d 737, 743 (App. Div. 1962)) (citations omitted). Here, defendant asserts that "where Defendant is appropriately selling Videos featuring Plaintiff, he may use Plaintiff's name and image in order to present the content of the Videos." (Def.'s Prop. Find. of Fact & Concl. of Law ¶ 54.)

However, "[a]s the New York courts themselves have recognized, 'It is clear that what drives the 'incidental use' exception is the First Amendment interest in protecting the ability of news disseminators to publicize, to make public, their own communications.'" Groden, 61 F.3d at 1050-51 (quoting Stern v. Delphi Internet Servs. Corp., 626 N.Y.S.2d 694, 700 (Sup. Ct. 1995); citing Arrington v. New York Times Co., 434 N.E.2d 1319, 1322 (N.Y. 1982)); see also Hoepner v. Kruger, 200 F. Supp. 2d 340, 350 (S.D.N.Y. 2002) ("advertising that is undertaken in connection with a use protected by the First Amendment falls outside the statute's reach. The [incidental use] exception gives news agencies,

---

[41] To the extent defendant argues that plaintiff disposed of his rights by placing the videos in the public domain, defendant's argument likewise fails.  See Oliveira v. Frito-Lay, Inc., 251 F.3d 56, 64 (2d Cir. 2001) (finding that the district court "could not properly read the complaint as admitting that plaintiff was not the beneficiary of any contract rights pertaining to the public release of her recorded performance or that she placed her recording in the public domain."); Neyland v. Home Pattern Co., 65 F.2d 363, 364-65 (2d Cir. 1933) (J. L. Hand.); Chambers, 2003 WL 749422, at *4 n.6. ("plaintiffs . . . made their recordings under contract, and cannot be said to have released their work, along with the protection of their voices, names, and likenesses, into the public domain."); Shaw v. Time-Life Records, 341 N.E.2d 817, 820 (N.Y. 1975) ("Since Shaw placed his arrangements in the public domain without the benefit of copyright protection, Time-Life was free to copy them and could truthfully state that the arrangements had been created by Artie Shaw."). There is no evidence that plaintiff placed the videos or the 2008 photographs into the public domain without any contract rights or intellectual property protections; on the contrary, plaintiff registered eight of the videos with the U.S. Copyright Office, and the photographs were published in magazines.

[42] The second "incidental use" exception, which defendant does not assert here, relates to "'isolated' or 'fleeting and incidental' uses of a person's name or image." Candelaria v. Spurlock, No. 08 Civ. 1830 (BMC)(RER), 2008 WL 2640471, at *2 (E.D.N.Y. July 3, 2008) (quotation omitted).

magazine publishers, etc. the ability to publicize their newsworthy articles without violating the right of privacy statutes.").

"The underlying purpose of sections 50 and 51 was to protect privacy without preventing publication of matters of public interest," Groden, 61 F.3d at 1051 (quoting Rand v. Hearst Corp., 298 N.Y.S.2d 405, 409-10 (App. Div. 1969), aff'd 257 N.E.2d 895 (1970)), and the "incidental use" exception has been invoked regarding advertisements for publications ranging from newsreels to an internet bulletin-board.[43] See id. at 1049 (collecting cases addressing the "incidental use" exception). However, those cases share a key element clearly lacking here—the defendants are media sources advertising their own wares. Although defendant is correct that the images of plaintiff in the 2008 photographs and YouTube clips literally "illustrate the content of the works being advertised," the circumstances of this case fall outside the boundaries of the incidental use exception. Even if I were to find that the videos themselves are newsworthy, or matters of the public interest, or a protectable artistic expression—and I do not so find—this is simply not the case of a media source seeking to advertise its own goods. Defendant's use of plaintiff's image to advertise those videos does not fall under the purview of an "incidental use."

As neither of the two exceptions asserted by defendant apply here, plaintiff prevails on his Section 51 claim as to the 2008 photographs and three YouTube clips.

## DAMAGES

The Copyright Act and Section 51 each provide for monetary and equitable relief. Under the Copyright Act, "an infringer of copyright is liable for either—(1) the copyright owner's actual damages and any additional profits of the infringer . . . ; or (2) statutory damages, as provided by subsection (c)."

---

[43] Since this form of the exception was introduced in 1919, it has been used to exclude lawful uses ranging from advertisements depicting the content of newsreels, Humiston v. Universal Film MFG. Co., 178 N.Y.S. 752 (App. Div. 1919); to the use of Ayn Rand's name in a review on another author's book jacket, Rand, 298 N.Y.S.2d 405; to the use of Howard Stern's name and picture to advertise an internet bulletin board debate on his gubernatorial candidacy, Stern, 626 N.Y.S.2d 694; to advertisements featuring segments of the Daily Show where Jon Stewart discusses clips of another comedian's show, Kane v. Comedy Partners, No. 00 Civ. 158 (GBD), 2003 WL 22383387 (S.D.N.Y. Oct. 16, 2003).

17 U.S.C. § 504(a). The Court may also grant a temporary or final injunction "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a).

Under Section 51, a plaintiff may seek compensatory damages "for any injuries sustained by reason of [defendant's] use" of plaintiff's image, injunctive relief "to prevent and restrain the use," and, if the defendant has "knowingly used such person's name, portrait, picture or voice" without the plaintiff's consent, exemplary damages.[44] N.Y. Civ. Rights Law § 51 (emphasis added). "Ultimately, the determination of damages under § 51 is left to the sound discretion of the court." Garis v. Uncut-RawTV, Inc., No. CV 06–5031 (ADS)(AKT), 2011 WL 4404035, at *3 (quotation omitted), adopted by 2011 WL 4404032 (E.D.N.Y. Sept. 21, 2011).

Here, the Court construes plaintiff's amended complaint and post-trial submissions to seek $25,000 in statutory damages under the Copyright Act,[45] as well as $25,000 in compensatory and exemplary damages under Section 51.[46] He also seeks permanent injunctive relief under both statutes. (Am. Compl. ¶¶ 16-17, 78-79; Pl.'s Am. Find. of Fact & Concl. of Law 6, 10.)

---

[44] The full text reads that plaintiff, "may maintain an equitable action in the supreme court of this state against the person, firm or corporation so using his name, portrait, picture or voice, to prevent and restrain the use thereof; and may also sue and recover damages for any injuries sustained by reason of such use and if the defendant shall have knowingly used such person's name, portrait, picture or voice in such manner as is forbidden or declared to be unlawful by section fifty of this article, the jury, in its discretion, may award exemplary damages." N.Y. Civ. Rights Law § 51.

[45] In plaintiff's amended complaint, he seeks "statutory damages of $25,000 pursuant 17 U.S.C. § 504(c)(1)(2) for damages due to defendant's intentional sabotage and infringement," as well as "compensatory, declaratory, and exemplary damages…in any amount deemed proper by the court." (Am. Compl. ¶ 78.) He further states that "Plaintiff has no adequate remedy at law. Defendant has and will cause irreparable damage to plaintiff…if he is not disciplined. Plaintiff…is entitled to Preliminary and Permanent injunctive relief restraining [defendant] from all use of [plaintiff's] images, and all videos of [plaintiff], and removal of all pictures and videos of plaintiff…from Hairvideostore.com, Thepireatebay.org, and Youtube.com." (Id. ¶ 79.) In his post-trial submissions, plaintiff describes his "DVD Sales Damages" and reiterates that "Defendant is liable for $25,000 and any other award the court will grant plaintiff. Along with an injunction against defendant to prevent further damage." (Pl.'s Am. Find. of Fact & Concl. of Law 10.)

[46] Plaintiff's amended complaint states that he seeks "exemplary, statutory, and punitive damages" due to "a deliberate and constantly reoccurring act of willful harassment by defendant," (Am. Compl. ¶¶ 15-16), and his post-trial submissions request compensation "for [defendant's] creating stress, distraction, damage to plaintiffs goodwill and reputation, and taking time and attention away from plaintiffs concentration on his own business resulting in the closing of plaintiffs storefront." (Pl.'s Am. Find. of Fact & Concl. of Law 6.)

## I. Monetary Relief

### A. Duplicative Damages

Plaintiff seeks compensatory and punitive damages under both the Copyright Act and Section 51. The Court is mindful that plaintiff is "not entitled to duplicative recoveries for the same intellectual property theft under multiple theories of liability. As the Second Circuit has made clear, '[a] plaintiff seeking compensation for the same injury under different legal theories is of course entitled to only one recovery.'" Tu v. TAD Sys. Tech., Inc., No. 08-CV-3822 (SLT)(RM), 2009 WL 2905780, at *4 (quoting Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995)). Although a defendant "may have committed [multiple] wrongs under the separate statutory schemes . . . those wrongs . . . produced one harm—[plaintiff's] economic loss." Lyons P'ship, L.P. v. D & L Amusement & Entm't, Inc., 702 F. Supp. 2d 104, 118 (E.D.N.Y. 2010) (quoting Tu, 2009 WL 2905780, at *4) (finding a single award of statutory damages per item infringed under the Copyright and Lanham Acts, "regardless of the legal theories under which the claims were jointly brought"); see also Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc., No. CV 08-0068(KAM)(JO), 2010 WL 2133937, at *15 (E.D.N.Y. Mar. 11, 2010) (denying plaintiff damages under his state common law claims for unfair competition and trademark infringement because they "would be 'coextensive' with, and thus duplicative of, the statutory damages award under the Lanham Act, all of which spring from the same infringement.").

Here, the gravamen of plaintiff's claims under both statutes is defendant's reproduction and distribution of plaintiff's videos, including eight copyrighted videos, on the internet. Therefore, I find the Copyright Act to provide the most appropriate relief for plaintiff's claims. The Copyright Act provides for a broad award of statutory damages, and to the extent those damages are co-extensive with the compensatory and exemplary damages provided under Section 51, I decline to award plaintiff duplicative damages under Section 51. See Tu, 2009 WL 2905780, at *3-5 ("Plaintiffs are not entitled to duplicative statutory damages under the Copyright Act, DMCA, and the Lanham Act. Rather, because the gravamen of this case is that Defendants sold and distributed a pirated version of Plaintiffs'

40

copyrighted material, the Court finds that damages under the Copyright Act to be the most appropriate remedy."); Evony, LLC v. Holland, No. 2:11–cv–00064, 2011 WL 1230405, at *3-4 (W.D. Pa. Mar. 31, 2011) (relying on Second Circuit case law to award copyright damages where plaintiff's claims under the Copyright Act, Lanham Act, and DMCA were "coextensive: it is Defendant's website and the products on his website that account for Plaintiffs' economic damages under any of the three federal statutes . . . the gravamen of this case is that Defendant . . . copied the copyrighted *Evony* Game Client and published its own copy . . . , which enables players to play an unauthorized copy . . . on Defendant's website . . . .").

## B. Statutory Damages under the Copyright Act

A plaintiff electing statutory damages is entitled to "an award of statutory damages for all infringements involved in the action, with respect to any one work, for which any one infringer is liable individually . . . in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). "Statutory damages are to be awarded per work infringed, regardless of the number of times said work was infringed." Seoul Broad. Sys. Int'l, Inc. v. John Kim Sang, 754 F. Supp. 2d 562, 568 (E.D.N.Y. 2010). Statutory damages serve both compensatory and deterrent functions, and they are especially appropriate where a plaintiff's actual damages are difficult to determine. Yash Raj Films (USA), Inc. v. Adda Rong, Inc., No. CV 08-2280 (CBA)(VVP), 2010 WL 1270013, at *5 (E.D.N.Y. Mar. 12, 2010) (citations omitted). District courts have "wide discretion" to grant an appropriate award of damages, and they consider the following factors:

> (1) the infringer's state of mind; (2) the expenses saved, and profits earned, by the infringer; (3) the revenue lost by the copyright holder; (4) the deterrent effect on the infringer and third parties; (5) the infringer's cooperation in providing evidence concerning the value of the infringing material; and (6) the conduct and attitude of the parties.

Bryant v. Media Right Prods., Inc. 603 F.3d 135, 143-44 (2d Cir. 2010) (quotation and citations omitted). I analyze the above factors in turn.

## 1. Defendant's State of Mind

"The infringer's state of mind is a 'key' and 'initial' factor in determining the appropriate statutory damage award." Bryant v. Europadisk, Ltd., No. 07 Civ 3050 (WGY), 2009 WL 1059777, at *7 (S.D.N.Y. Apr. 15, 2009) (quoting Nat'l Football League v. PrimeTime 24 Joint Venture, 131 F. Supp. 2d 458, 473 (S.D.N.Y. 2001)).  "Where a defendant has acted willfully, a statutory award should incorporate not only a compensatory, but also a punitive component to discourage further wrongdoing by the defendants and others." Hounddog Prods., L.L.C. v. Empire Film Group, Inc., No. 09 Civ. 9698 (VM), 2011 WL 5519829, at *9 (S.D.N.Y. Nov. 10, 2011) (quotation omitted).  A Court may increase the award of statutory damages up to $150,000 per infringement for "willful" violations, or it can decrease the award to as little as $200 per infringement when the violation is "innocent." 17 U.S.C. § 504(c)(1)-(c)(2). It is plaintiff's burden to prove that defendant's violations were willful, and defendant's burden to prove his innocence. Bryant, 603 F.3d at 143. To prove willfulness, plaintiff must demonstrate that defendant "had knowledge that [his] conduct represented infringement or . . . recklessly disregarded the possibility." Id. at 143 (quoting Twin Peaks Prods., Inc. v. Publ'ns. Int'l Ltd., 996 F.2d 1366, 1382 (2d Cir. 1993)). In evaluating an infringer's state of mind, courts look to factors such as whether the infringer was on notice that the copyrighted work was protected, Castle Rock Entm't v. Carol Pub. Group, Inc., 955 F. Supp. 260, 267 (S.D.N.Y. 1997); whether the infringer had received warnings of the infringements, Twin Peaks Prods., Inc., 996 F.2d at 1372; as well as whether the infringer had experience with previous copyright ownership, prior lawsuits regarding similar practices, or work in an industry where copyright is prevalent, EMI Entm't World, Inc. v. Karen Records, Inc., No. 05 Civ. 390 (RJH)(JCV), 2011 WL 3795037, at *5-6 (S.D.N.Y. Aug. 24, 2011). Defendant, on the other hand, can argue for reduced damages by proving that he "was not aware and had no reason to believe that his . . . acts constituted an infringement." 17 U.S.C. § 504(c)(1)-(c)(2); see also Bryant, 603 F.3d at 143. He must show both (1) a subjective good faith belief that his conduct was innocent, and (2) that his belief was objectively reasonable under the circumstances. Childress v. Taylor, 798 F. Supp. 981, 994

42

(S.D.N.Y. 1992) (finding that the infringer's subjective belief that she was a co-author was not enough to establish her innocence).

In this case, plaintiff has demonstrated that defendant willfully infringed his copyrights. Defendant was clearly aware of plaintiff's registered copyrights before he began promoting the videos, and he continued to promote the videos on the internet after plaintiff sent him multiple take-down notices, as well as after plaintiff filed this lawsuit. Although the brothers' earlier misuse of copyright symbols and warnings demonstrates a lack of sophistication regarding the copyright laws, defendant clearly knew that plaintiff had obtained certain rights by registering the copyrights, and that plaintiff adamantly opposed defendant's assertion of rights in the videos. Even if defendant believed, incorrectly, that as a joint author he could not infringe plaintiff's copyright, or that copyrighting a compilation of the videos gave him free reign to use plaintiff's previously copyrighted works, he at least recklessly disregarded the possibility that his belief was incorrect. He certainly had reason to believe that his actions could constitute infringement; any subjective belief otherwise was not objectively reasonable. I therefore find that defendant's conduct was willful, and that plaintiff is eligible for an increased amount of statutory damages.

### 2. Additional Factors for Damages

Although plaintiff is eligible to receive $750 to $150,000 in damages for each of the eight videos, "statutory damages cannot be divorced from economic reality" and "should bear some relationship to actual damages suffered." EMI Entm't World, Inc. , 2011 WL 3795037, at *8-9 (quotations omitted) (collecting cases where courts awarded less than the statutory maximum for willful infringement); see also Yurman Studio, Inc. v. Castaneda, Nos. 07 Civ. 1241(SAS), 07 Civ. 7862(SAS), 2008 WL 4949775, at *3 (S.D.N.Y. Nov. 19, 2008) ("Congress's decision to dramatically increase the cap on statutory damages . . . does not require imposition of monumental statutory damages against smaller-scale or shorter-term willful infringers.").

43

The second and third factors considered by the courts relate to the parties' finances. At trial, plaintiff provided no evidence as to defendant's profits, and defendant's testimony that he sold a total of nine to fifteen DVDs sheds no light on his profits from selling the eight DVDs at issue. (Tr. 274.) Further, although plaintiff has demonstrated that his revenue from PayPal sales declined precipitously between 2007 and 2009, there is no record evidence linking that decline to defendant's use of the eight protected videos. Nor is there evidence as to how many times the eight videos were downloaded for free. Plaintiff did not establish how those downloads or "views" caused him to lose profits.

The fourth factor, the deterrent effect of any damages, is difficult to evaluate. Prior to and during at least part of 2008, defendant repeatedly infringed plaintiff's copyrights despite plaintiff's protests. The record suggests that defendant's various web sites and postings have since been removed.[47] As to defendant's future conduct, he testified that if he won this lawsuit, he would "continue using the copyright as I created it," and if he lost he would appeal and continue to "fight for" his copyright interest. (Tr. 267.) He also stated that he has not "gotten around to" producing more hair videos or attempting to copyright other contributions to past videos. (Tr. 279, 304-05.)

The fifth and sixth factors relate to the parties' cooperation and conduct. At trial, defendant's counsel stated that defendant provided records of his video sales during discovery, which plaintiff did not introduce into evidence. (Tr. 275.) The parties fought this dispute bitterly and prolonged this litigation. Defendant also continued the infringing behavior even after the case was in Court.

---

[47] Plaintiff testified that he removed most of defendant's postings immediately, and defendant's former counsel wrote to the Court to state that defendant had been ordered to remove information from the bitorrent site The Pirate Bay. (Ex. 19.) Further, the Court's internet search for "hairvideostore.com" revealed a short segment of only one video on the site www.veoh.com, titled "Fusioh [sic] Hair Extensions," http://www.veoh.com/watch/v6408209rTF2rFsX (last visited March 29, 2012.) The site lists defendant's copyright number and HairVideoStore.com website, and states that the video was added "4 yrs ago." See Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); Hotel Emps. Union, Local 100 v. City of New York Dep't of Parks & Rec., 311 F.3d 534, 540 (2d Cir. 2002); Patsy's Italian Rest., Inc. v. Banas, 575 F. Supp. 2d 427, 443 (E.D.N.Y. 2008) ("It is generally proper to take judicial notice of articles and Web sites published on the Internet.") (citations omitted).

### 3. Weighing the Factors

Regardless of the lack of quantifiable evidence concerning the extent of plaintiff's losses, "the failure to establish actual damages does not impair this Court's ability to devise a proper statutory award." Tu, 2009 WL 2905780, at *6 (internal citation omitted) (finding "almost no evidence" as to the monetary factors and focusing on deterrence and willfulness to award plaintiff $150,000 per work infringed); Yash Raj Films (USA), Inc., 2010 WL 1270013, at *6 (highlighting plaintiff's unquantifiable damages and the need to punish willful infringement, and awarding plaintiff the requested $5,000 per infringement). "Indeed, this Court's task is to determine a 'just' award, in which 'the court's discretion and sense of justice are controlling subject only to the specific statutory limits.'" Broadcast Music, Inc. v. Haibo, Inc., No. 10–CV–240S, 2012 WL 843424, at *4 (W.D.N.Y. Mar. 12, 2012) (quoting Engel v. Wild Oats, Inc., 644 F. Supp. 1089, 1091 (S.D.N.Y. 1986)). It is clear that plaintiff has suffered financial loss due to his conflict with his brother, and that compensatory and punitive measures are appropriate. Further, although defendant has testified that he will "fight for" his copyrights through an appeal, the fact that he continued to infringe plaintiff's copyrights well into 2008 requires a measure for deterrence.

Plaintiff requests $25,000, which translates to $3,125 per infringed work. The Court finds this amount of damages appropriate. The statutory minimum of $750 per work is too low considering defendant's willful conduct over the many years of this litigation; an amount above plaintiff's request is too high considering that defendant earned almost no profits from the videos, and that he did believe— though erroneously and recklessly—that he deserved some right to use the videos. Thus, I find an award of $3,125 per work to be appropriate and award plaintiff $25,000 in statutory damages on his copyright infringement claim.

**C. Compensatory and Exemplary Damages under Section 51**[48]

Section 51 permits compensation for a plaintiff's actual monetary damages and injury to his feelings.[49] Marano v. Aaboe, No. 05 Civ. 9375 (BSJ)(RLE), 2010 WL 6350785, at *6-7, adopted by 2011 WL 1157553 (S.D.N.Y. Mar. 28, 2011). "A plaintiff should receive damages for mental stress and for injury to her property interest inherent and intricably [sic] woven in her personality." Garis, 2011 WL 4404035, at *3 (quotation marks omitted) (quoting Marano, 2010 WL 6350785, at *7). Courts also have discretion to award exemplary damages if a defendant "knowingly" used the plaintiff's name and image without consent.[50] N.Y. Civ. Rights Law § 51. "The award of exemplary damages is warranted when such an award is necessary to deter future conduct that violates Section 51." Garis, 2011 WL 4404035, at *4 (quotation omitted); see also Big Seven Music Corp., 554 F.2d at 513 (citations omitted) (noting statute's underlying "concern about punishment and deterrence.") In considering whether to award exemplary damages,

> [n]either malice nor recklessness need be shown; it is enough to show that defendant "knowingly used" plaintiff's likeness. "Knowing use" refers to a defendant's knowledge of a subject's lack of consent, not to knowledge of use per se. In determining whether an injury merits exemplary damages, courts must consider "the circumstantial settings" in which the violation occurred. Such factors include good faith or its absence; mistake or knowing impertinence; misapprehension of evidence of approval. Such knowledge could be factual or constructive and may be inferred from a defendant's conduct.

Marano, 2010 WL 635785, at *7.

---

[48] Courts routinely refer to the "exemplary damages" under this statute as either "exemplary" or "punitive." See, e.g., Big Seven Music Corp., 554 F.2d at 513 (citations omitted).

[49] I do not subscribe to the notion, still cited by some courts in this Circuit, that "damages under the New York statute often are only nominal since they are designed primarily to compensate for injury to feelings." Lerman v. Flynt Distrib. Co., 745 F.2d 123, 141 (2d Cir. 1984); see also Zoll v. Ruder Finn, Inc., No. 02 Civ. 3652 (CSH), 01 Civ. 1339 (CSH), 2004 WL 527056, at *2-3 (S.D.N.Y. Mar. 16, 2004) (discussing Lerman to state that plaintiff's damages would likely be nominal); Garis, 2011 WL 4404035, at *3 (citing Zoll for primacy of damages for injuries to feelings); 5 McCarthy on Trademarks & Unfair Competition § 28:38 (4th ed. 2012) ("In the light of later cases, early decisions to the effect that the New York statute only permits damage recovery for injured feelings is no longer accurate. . . . However, some judges persist in the notion that damages for violation of the New York statute are limited to injury to feelings."). This rationale was based on the now defunct idea that Section 51 only encompassed a right of privacy, and that New York maintained a separate common law right of publicity. See Lerman, 745 F.2d at 141 (citing Lombardo v. Doyle, Dane & Bernbach, Inc., 396 N.Y.S.2d 661, 664 (App. Div. 1977); see also, Pirone, 894 F.2d at 585 (Section 51 subsumes any previous common law right to publicity).

[50] "While the statute refers only to an award of exemplary damages by a 'jury,' it has been held that a judge acting as a finder of fact has 'the same right' as would a jury to award such damages under § 51." Big Seven Music Corp, 554 F.2d at 513 n.7 (2d Cir. 1977) (quoting Rosenberg v. Lee's Carpet & Furniture Warehouse Outlet, Inc., 363 N.Y.S.2d 231, 234 (Sup. Ct. 1974)).

As to plaintiff's request for compensatory damages, I decline to award plaintiff further damages for his economic losses, which I considered when I awarded plaintiff's statutory damages under the Copyright Act. Even if these economic losses were not fully coextensive with those considered above, plaintiff did not present any evidence of his economic damages related to defendant's use of his image. Although I did not explicitly consider plaintiff's emotional stress when I awarded his statutory damages under the Copyright Act, plaintiff again offers no proof to substantiate his allegations of "emotional damages including loss of sleep, depression, nervous breakdowns." (Am. Compl. ¶ 13.) See Garis, 2011 WL 4404035, at *4 (awarding damages for emotional distress based on plaintiff's medical records); Marano, 2010 WL 6350785, at *7 ("Though [plaintiff] states that he has suffered from insomnia and that he has become reluctant to participate in the industry he once enjoyed, he fails to provide any evidence to support the amount he requests or to allow the Court to make a reasoned decision.") (record citation omitted); Gallon v. Hustler Magazine, Inc., 732 F. Supp. 322, 325-26 (N.D.N.Y. 1990) (damages for "persistent mental anguish" substantiated by evidence that two expert psychiatrists linked plaintiff's mental health issues to publication of violating photograph). Thus, plaintiff's request for compensatory damages related to his economic losses and emotional stress under Section 51 is denied.

Plaintiff's request for exemplary damages is likewise denied as duplicative. Although plaintiff proved that defendant knowingly used plaintiff's image to advertise the videos without plaintiff's consent (and despite plaintiff's immediate and adamant objections), I considered the need to punish and deter defendant's willful conduct when I awarded plaintiff's statutory damages under the Copyright Act.[51] See On Davis v. The Gap, Inc., 246 F.3d 152, 172 (2d Cir. 2001) ("The purpose of punitive damages—to punish and prevent malicious conduct—is generally achieved under the Copyright Act through the provisions of 17 U.S.C. § 504(c)(2), which allow increases to an award of statutory damages

---

[51] Although some Courts have allowed awards for punitive damages for causes of action that "reflect assessments of distinct harms caused by distinct acts," that is not the case here. Roy Export Co. Establishment of Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc., 672 F.2d 1095, 1106-07 (2d Cir. 1982) (allowing a jury award of separate statutory damages for common law unfair competition and copyright claims where one claim related to copyrighted films and the other to an unpublished compilation of films).

in cases of willful infringement.") (citations omitted). Plaintiff's request for separate exemplary damages is therefore denied.

## II. Permanent Injunctive Relief

### A. Copyright Infringement

Pursuant to Section 502 of the Copyright Act, the Court may grant temporary or final injunctions "on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "An injunction does not "automatically follow[ ] a determination that a copyright has been infringed." Pearson Educ., Inc. v. Vergara, No. 09 Civ. 6832 (JGK)(KNF), 2010 WL 3744033, at *4 (S.D.N.Y. Sept. 27, 2010), adopted by Order of May 11, 2011. Rather, to obtain a permanent injunction in a copyright infringement case, plaintiff must satisfy the traditional four-factor test reiterated by the Supreme Court in eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006) ("eBay"):

> (1) that [he] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Id. (quoting eBay, 547 U.S. at 391); see also Hounddog Prods., 2011 WL 5519829, at *10. "Harm might be irremediable, or irreparable, for many reasons, including that a loss is difficult to replace or difficult to measure, or that it is a loss that one should not be expected to suffer." Hounddog Prods., 2011 WL 5519829, at *10 (quoting Salinger v. Coltina, 607 F.3d 68, 81 (2d Cir. 2010)); see also WPIX, Inc. v. ivi, Inc., 765 F. Supp. 2d 594, 617 (S.D.N.Y. 2011) ("In copyright cases, harm can often be irreparable either in light of possible market confusion, because it is 'notoriously difficult' to prove the loss of sales due to infringement, and because of loss of the First Amendment 'right *not* to speak.'") (quoting Salinger, 607 F.3d at 81).

Here, plaintiff requests a permanent injunction "restraining [defendant] from all use of [plaintiff's] images, and all videos of [plaintiff], and removal of all pictures and videos of plaintiff . . . from Hairvideostore.com, Thepireatebay.org, and Youtube.com." (Am. Compl. ¶ 79.)

48

The four eBay factors weigh in plaintiff's favor.  First, he has demonstrated that he suffered an irreparable injury; I credit his testimony that he lost at least some video sales, business at his salon, relationships with magazines, and a significant amount of time due to defendant's infringing behavior. These losses, as well as plaintiff's lost opportunities to capitalize on DVD sales at a time when the economy and popularity of DVD media were more favorable to him, are difficult to measure and replace. These harms are significant hardships weighing in plaintiff's favor.  In contrast, defendant has shown no hardships other than the fact that he did not share in any reward from plaintiff's video sales.

Further, plaintiff has demonstrated that monetary deterrence is insufficient to compensate him for his losses. "A plaintiff has no adequate remedy at law where, absent an injunction, the defendant is likely to continue infringing its copyright(s)."[52] Id. at 10 (quoting Pearson, 2010 WL 3744033, at *4); see also Lyons P'ship, L.P., 702 F. Supp. 2d at 119 (citing Boisson v. Banian, Ltd., 280 F. Supp. 2d 10, 15 (E.D.N.Y. 2003)).

> Permanent injunctions are appropriate only where . . . there is a substantial likelihood of future infringements. On the other hand, permanent injunctive relief will not be awarded in cases where there is no history of infringement, the defendant is cooperative in ceasing to sell infringing products and there does not exist any probability of future infringement.

Boisson, 280 F. Supp. 2d at 19; see also 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.06[B][1][a] (Matthew Bender, Rev. Ed. 2011) ("injunctive relief ordinarily is not granted absent any threat of continuing or additional infringements.")

The evidence demonstrates that defendant has repeatedly and willfully infringed on plaintiff's copyrights well into 2008. He did not "cooperatively" cease his infringing behavior when plaintiff challenged it; even when defendant temporarily stopped promoting the videos through one website, he posted them on other sites. Further, defendant's promotions did not merely reflect an honest assertion of

---

[52] Some recent decisions granting permanent injunctions in this district have cited Nw. Nat'l Ins. Co. of Milwaukee, Wis. v. Alberts, 937 F.2d 77, 80 (2d Cir. 1991) to state that a showing of irreparable harm suffices to establish the inadequacy of remedies available at law. See, e.g., AW Indus., Inc. v. Sleepingwell Mattress Inc., No. 10–cv–04439 (NGG)(RER), 2011 WL 4404029, at *11 (E.D.N.Y. Aug. 31, 2011).  However, this case merely notes that these two equitable factors overlap because the plaintiff's rights in that case would have been extinguished if preliminary injunctive relief would have been denied. Nw. Nat'l Ins. Co. of Milwaukee, Wis., 937 F.2d at 80. That proposition is inapplicable here.

his alleged joint copyright interest; rather, he used spiteful language, lowered the prices, and ultimately posted the videos on sites that provided downloads of the videos for free. At trial, defendant demonstrated a willingness to make repeated false statements; during defendant's cross-examination by plaintiff, the Court twice reminded defendant that he could not change his earlier testimony on direct examination merely because he was being questioned by his brother. Although defendant did not state that he intends to continue his infringing behavior, based on the record as a whole, there is a substantial likelihood that defendant will continue to infringe plaintiff's copyrights. Finally, the public interest would not be disserved by the injunction.

Thus, the equities weigh in plaintiff's favor, and his request for a permanent injunction under the Copyright Act is granted. Defendant is hereby enjoined from using the materials protected by plaintiff's eight copyrights.

### B. Section 51

Section 51 provides for equitable relief to "prevent and restrain" the prohibited use of a plaintiff's name and image. N.Y. Civ. Rights Law § 51. Plaintiff seeks "permanent injunctive relief, restraining defendant from all further use of [plaintiff's] name, image, and likeness and videos of plaintiff," and he requests "a court order to remove the unauthorized video commercials . . . and all pictures of Ashanta from Youtube.com and Hairvideostore.com." (Am. Compl. ¶¶ 15-17.)

It is unclear whether the traditional analysis for equitable relief applies to claims under Section 51. The court in ASA Music Prods. v. Thomsun Electronics stated that "[i]njunctive relief is mandated under Section 51," 49 U.S.P.Q.2d at *1554, and there is state law precedent finding that "the right to injunctive relief may be absolute regardless of relative damage to the parties."[53] Marcinkus v. NAL Pub. Inc., 522 N.Y.S.2d 1009, 1015 (Sup. Ct. 1987) (citations omitted).

---

[53] See Onassis v. Christian Dior New York, Inc., 472 N.Y.S.2d 254, 258, 263 (Sup. Ct. 1984) (stating that "[o]nce the violation is established, the plaintiff may have an absolute right to injunction, regardless of the relative damage to the parties," and granting a preliminary injunction based on defendants' violation of Section 51) (citations omitted), aff'd 488 N.Y.S.2d 943; Durgom v. Columbia Broad. Sys., Inc., 214 N.Y.S.2d 752, 754 (Sup. Ct. 1961) ("The right to enjoin a proposed use of a person's name for trade, without his *written* consent, is absolute, regardless of the detriment resulting to the

However, other federal and state courts have proceeded to weigh the traditional equitable factors. See, e.g., Garis, 2011 WL 4404035, at *3 (granting an injunction in a default case because plaintiff had demonstrated success on the merits and irreparable harm); Baldeo v. Majeed, No. 16140/2011, 2011 WL 6187149, at *2-4 (N.Y. Sup. Ct. 2011) (analyzing the traditional equitable factors to deny a preliminary injunction). Indeed, the court in Schoeman v. Agon Sports, LLC noted that while some state court cases "suggest that a traditional analysis of the three prong test for a preliminary injunction can be avoided, other cases apply such analysis in determining whether a preliminary injunction should be granted." 816 N.Y.S.2d 701, at *1 (Sup. Ct. 2006). That court went on to analyze the traditional equitable factors "to assure a complete analysis of the issues presented on this motion." Id. (granting preliminary injunction); see also 1 McCarthy, Rights of Publicity & Privacy § 6:97 (2d ed. 2011) ("It is not clear if in a motion for a preliminary injunction the statutory authorization supplants the traditional equitable test. Out of caution, most courts will employ the traditional approach of examining irreparable harm, likelihood of success and balancing of equities.") (citing Schoeman, 816 N.Y.S.2d 701). Therefore, to be both cautious and consistent, I proceed to analyze plaintiff's claim according to the traditional four-factor eBay test.

My analysis here parallels my analysis of plaintiff's request for an injunction under the Copyright Act. Plaintiff's Section 51 claim encompasses the same irreparable economic harms to plaintiff's business and reputation, but also reaches further. The award of monetary damages is insufficient to prevent defendant from using plaintiff's name, image, or likeness to advertise defendant's

---

defendant. . . . Regardless of what the equities of the situation may be and the damage to defendants from the granting of the injunction, a denial of injunctive relief for a conceded violation of the statute would emasculate the provisions for injunctive relief and cannot be justified. Plaintiff, as the statute is worded, should not be limited to an action for damages.") (citation omitted); Blumenthal v. Picture Classics, 257 N.Y.S. 800, 801 (App. Div. 1932) ("Sections 50 and 51 of the Civil Rights Law give to the plaintiff an absolute right to have the defendants enjoined from using her picture for trade purposes."); Lawrence E. Savell, Right of Privacy - Appropriation of a Person's Name, Portrait, or Picture for Advertising or Trade Purposes Without Prior Written Consent: History and Scope in New York, 48 Albany L. Rev. 1, 43-44 (1983) (noting that the right to injunctive relief has been held to be absolute, with one exception where equities were weighed); but see Albert v. New York Tel. Co., 204 N.Y.S.2d 36 (Sup. Ct.), (By balancing the equities, the court concludes that the exercise of a sound discretion requires a denial of the injunctive relief sought. It is apparent that to grant the application, the damage to defendants would be by far greater than the damage to plaintiff by denying it. Equity must guard against an inequitable result."), aff'd.656 N.Y.S.2d 1019 (1960).

wares in the future. Although it appears that defendant, for the moment, has stopped selling the nineteen videos, his claim that he simply "hasn't gotten around to" producing more videos is especially relevant here, as defendant could again use plaintiff's image for his own commercial gain. The fact that defendant made these videos with plaintiff and attempted to copyright all the videos as a compilation does not confer a right to use plaintiff's image without his consent. Thus, I find an extra measure of deterrence is warranted to prevent defendant from using plaintiff's image for advertising or other commercial purposes without plaintiff's consent. I also find it is in the public's interest to enforce the protections of Section 51 in this case.

In light of these equitable factors, plaintiff is entitled to an injunction under Section 51. Defendant is hereby enjoined from using plaintiff's name, image, and likeness for any commercial purpose without plaintiff's consent.

## CONCLUSION

This decision simply cannot repair the damage done by and between these two brothers, as well as to their family. Federal and state law cannot end this dispute for good; that is up to plaintiff and defendant. As I said to these brothers in court, life is short and relationships are often more valuable than money. They should put this matter to rest.

The Court finds that plaintiff has proved by a preponderance of the evidence that defendant infringed plaintiff's copyright on the eight DVDs and violated plaintiff's right to privacy and publicity under Section 51 of the New York Civil Rights Law. Plaintiff is awarded $25,000 in statutory damages against defendant. Plaintiff's claims for unfair competition and anticybersquatting protection under the Lanham Act fail. Defendant fails to prove by a preponderance of the evidence his counterclaim for joint authorship under the Copyright Act. Plaintiff's requests for injunctive relief are granted. Defendant is hereby enjoined from using the materials protected by plaintiff's eight copyrights and from using plaintiff's name, image, and likeness for any commercial purpose without plaintiff's consent. The Clerk of Court shall enter judgment accordingly and close this case.

SO ORDERED.

/Signed by Judge Lois Bloom/

LOIS BLOOM
United States Magistrate Judge

Dated: March 30, 2012
       Brooklyn, New York